# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39761**

———————————

**UNITED STATES**
*Appellee*

v.

**Jamal X. WASHINGTON**

First Lieutenant (O-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 30 July 2021

———————————

*Military Judge:* Christopher M. Schumann.

*Approved sentence:* Dismissal. Sentence adjudged 13 April 2019 by GCM convened at Malmstrom Air Force Base, Montana.

*For Appellant:* Major M. Dedra Campbell, USAF; Robert Feldmeier, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Major Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON and MEGINLEY, *Appellate Military Judges.*

Senior Judge POSCH delivered the opinion of the court. Judge RICHARDSON filed a separate opinion concurring in part, dissenting in part, and dissenting in the result in part. Judge MEGINLEY filed a separate opinion concurring in part, dissenting in part, and dissenting in the result in part.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

POSCH, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact (Charge I), one specification of conduct unbecoming an officer (Charge II), and five specifications of fraternization (Charge III), in violation of Articles 120, 133, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 933, 934, respectively.[1] Appellant was acquitted of three other specifications of conduct unbecoming an officer that were charged as violations of Article 133, UCMJ, under Charge II. The adjudged and approved sentence consisted of a dismissal.

Appellant challenges his convictions in five assignments of error, three of which this court decides in this appeal:[2] (1) whether the evidence is factually insufficient as to each specification of Charges I and II, and both factually and legally insufficient as to the five specifications of Charge III; (2) whether the military judge abused his discretion when he struck Appellant's testimony concerning the "sexual transaction" at issue in the specification of Charge I;[3] and (3) whether Appellant is entitled to relief for excessive post-trial delay where the convening authority did not take action until 130 days after Appellant's court-martial. In addition to these issues, we address the issue of timely appellate review.

A divided three-judge panel of this court considered Appellant's claims and the court reached the following result: the findings of guilty as to Charges I and II and their specifications are affirmed. The findings of guilty as to Specifications 1 through 4 of Charge III are set aside and those specifications are dismissed with prejudice. The findings of guilty as to Specification 5 of Charge III and as to Charge III are set aside and Specification 5 of Charge III and Charge III are dismissed without prejudice to the Government's right to reinstitute court-martial proceedings against Appellant for the same offense. The sentence is set aside and a rehearing is authorized as to Specification 5 of

---

[1] Except where indicated, all references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[2] The judgment of the court moots two other assignments of error: (4) whether the military judge erred by allowing the Government to reopen its case to call a witness not previously disclosed to Appellant; and (5) whether the military judge abused his discretion by refusing to allow Appellant to admit examples of enlisted-senior officer leisure travel as exculpatory evidence of a custom of the Air Force to defend against Specifications 1 through 4 of Charge III.

[3] This assignment of error was filed under seal and this court's decision reveals information that is necessary to resolve the issue.

Charge III and Charge III, and the sentence. We reach this result in separate opinions of the judges assigned to a duly constituted panel of this court:

- As to Charges I and II and their specifications, Senior Judge Posch, joined by Judge Richardson, affirms the findings of guilty. Judge Meginley dissents.

- As to Specifications 1 through 4 of Charge III, the panel unanimously finds Appellant's convictions are legally insufficient, sets aside the findings of guilty, and dismisses Specifications 1 through 4 with prejudice.

- As to Specification 5 of Charge III, Senior Judge Posch finds the conviction is legally insufficient and would set aside the findings of guilty and dismiss Specification 5 of Charge III and Charge III with prejudice. Judge Richardson dissents, finding Appellant's conviction of Specification 5 of Charge III is legally sufficient. Judge Meginley concurs in part and dissents in part to Senior Judge Posch's opinion with respect to this specification. Judge Meginley would dismiss Specification 5 of Charge III and Charge III without prejudice, finding the military judge abused his discretion in striking portions of Appellant's testimony, which in doing so, compromised Appellant's right to a fair trial. Accordingly, it is the judgment of the court that the findings of guilty to Specification 5 of Charge III and Charge III are set aside and Specification 5 of Charge III and Charge III are dismissed without prejudice to the Government's right to reinstitute court-martial proceedings against Appellant for the same offense. We reach this conclusion because Senior Judge Posch, joined by Judge Meginley, agree that dismissal is the appropriate remedy, and Senior Judge Posch stands alone in finding dismissal *with prejudice* should be the result.

Finding no further error, the case is returned to The Judge Advocate General for remand to an appropriate convening authority for further proceedings consistent with this decision.

## I. BACKGROUND

Appellant received his commission as an officer in the United States Air Force through the Reserve Officers Training Corps (ROTC). In November 2015, after a permanent change of station from an installation in the Air Education and Training Command (AETC), Appellant arrived at Malmstrom Air Force Base (AFB), Montana, and was assigned as a flight commander overseeing security operations. The events that became the subject of Appellant's court-martial and this appeal occurred two years later. In August 2017, Appellant, still at Malmstrom AFB, was reassigned to duty as a convoy commander where he

led a team of security forces Airmen on the Convoy Response Force (CRF).[4]

Shortly after assuming his new duties, Appellant began socializing with a group of junior enlisted Airmen on the CRF who were in the grades of senior airman (E-4) and below and under his supervision. The CRF leadership was organized with one officer who served as the convoy commander (Appellant), one or two senior noncommissioned officers (NCO), and several NCOs in the grades of technical sergeant (E-6) and staff sergeant (E-5). The balance of the force consisted of junior enlisted Airmen (E-4 and below). During the relevant period, Appellant made off-duty, overnight trips with one or more junior enlisted Airmen to Las Vegas, Nevada, Billings, Montana, and Spokane, Washington, in addition to spending time drinking and socializing in their homes. Evidence of Appellant's conduct with enlisted subordinates was the basis for his five convictions for fraternization (Charge III).

In time, Appellant's conduct with subordinates became a matter of official concern. An investigation of Appellant began after military authorities learned about his conduct with a staff sergeant, JA, when Appellant and members of the CRF were en route to annual training. That investigation eventually led authorities to interview CP, a company grade officer who was shadowing Appellant during that training. After a night of heavy drinking at a stopover en route to their destination, Appellant twice grabbed JA's penis through his clothes. In a separate incident later in Appellant's hotel room, Appellant touched CP's genitals through CP's clothing. Appellant's conduct with JA resulted in Appellant's conviction for conduct unbecoming an officer (Charge II). Appellant's conduct with CP was the basis for his conviction for abusive sexual contact (Charge I).

At trial, Appellant testified in his own defense. On direct examination by civilian defense counsel, Appellant disputed CP's testimony and offered a different account of what happened in the hotel room. Appellant denied he committed the charged sexual contact with CP, explaining he and CP engaged in a progression of mutually consensual, sexual contact with each other. Appellant testified they talked about their own sexual preferences and, at one point, CP disclosed to Appellant that CP "had men and women come on to him before." CP's special victims' counsel (SVC) objected to this line of questioning, but later withdrew that objection. The Prosecution did not object or move to

---

[4] Witnesses identified Appellant as a CRF flight "commander." In this capacity he was a staff officer with no command functions except those specifically delegated by competent authority. *See* Air Force Instruction (AFI) 51-604, *Appointment to and Assumption of Command*, ¶ 11.2.2 (11 Feb. 2016) (currently described in AFI 51-509, *Appointment to and Assumption of Command*, ¶ 11.2 (14 Jan. 2019) (flight commanders exercise command functions specifically delegated by superior competent authority)).

strike Appellant's testimony. Instead, after the SVC's objection was withdrawn, trial counsel informed the military judge he intended to pursue the matter further. Trial counsel explained he wanted to confront Appellant's innocent explanation of what happened in the hotel room by challenging the veracity of Appellant's testimony about CP's sexual predisposition.

What followed were several closed Article 39(a), UCMJ, 10 U.S.C. § 839(a), sessions. The military judge ruled Appellant's testimony implicated the provisions of Mil. R. Evid. 412, not least of all the military judge's duty under the rule to conduct a closed hearing to determine whether Appellant, as the proponent of the evidence at issue, could show that CP's sexual predisposition and other sexual behavior was relevant evidence and therefore admissible. The Defense argued Appellant's testimony did not implicate the rule, and objected to compelling Appellant to testify in a closed session outside the presence of the members. The military judge presented the Defense with the option that Appellant submit to cross-examination in a closed session, which would allow the military judge to decide whether an exception to the rule applied. In the alternative, the military judge would direct the members to disregard Appellant's testimony about CP's sexual behavior and sexual predisposition. The Defense chose neither option and the members were told to disregard the testimony Appellant gave about his account of the consensual circumstances surrounding his sexual interaction with CP in the hotel room.

In this appeal, we examine the sufficiency of the evidence upon which the Prosecution relied to convict, and whether the military judge abused his discretion when he struck part of Appellant's testimony.

## II. DISCUSSION

### A. Legal Insufficiency Determination for Fraternization (Specifications 1 through 5 of Charge III)

Appellant contends his convictions for fraternization, as charged in Specifications 1 through 5 of Charge III, are legally and factually insufficient. This opinion addresses the evidence supporting the findings of guilty, and concludes the Government failed to present evidence of the service customs Appellant was charged with violating. Accordingly, while my esteemed colleagues join in the opinion that Specifications 1 through 4 of Charge III are legally insufficient, I find Appellant's convictions are legally insufficient for all five specifications because no rational trier of fact could have found an essential element beyond a reasonable doubt. *See United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citing *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)).

### 1. Additional Background

Appellant regularly socialized off duty with a small group of junior enlisted Airmen under his supervision. The group would cook, drink alcohol, and play card games or just hang out and spend time at each other's homes. The group principally consisted of Appellant and five Airmen at or below the grade of senior airman (E-4), and the gatherings were not flight events or official functions.

According to the testimony of one senior airman, once Appellant started hanging out with the enlisted Airmen, Appellant went to their house parties "[p]retty much every weekend," and brought liquor and food. At times, members of the group engaged in horseplay and encouraged each other to drink alcohol. One Airman initially felt "uncomfortable" "knowing that [enlisted Airmen are] not supposed to be hanging out with officers" and because Appellant was in a leadership position. But eventually, "it just became normal knowing that [Appellant] hung out with [them] like that." None of that Airman's previous lieutenants went to house parties. In time, the Airmen grew more comfortable with Appellant's presence and it "felt like friends instead of rank."

In his testimony, Appellant admitted he went to one Airman's home multiple times and drank alcohol with his subordinates. Appellant believed that his socializing and drinking alcohol with junior enlisted Airmen did not adversely impact the good order and discipline in the CRF. In response to a question from his civilian defense counsel, Appellant acknowledged his belief that his conduct was "acceptable within the customs of the service that [he was] introduced to." Compared to his previous assignment to a unit in AETC that Appellant characterized as "very strict," Appellant observed Malmstrom AFB senior leaders drinking alcohol with their enlisted personnel at the club on base. He explained,

> [P]rior to this assignment I came from an AETC command. And AETC was very strict, [and] they were very stringent with their rules . . . . When I came to the base, Malmstrom [AFB] wasn't like that. We have what we call here, Defender Fridays and its cops from around the group and every squadron. We'd get together every Friday and drink.

Appellant testified there were instances during Defender Fridays when he observed commanders getting heavily intoxicated while consuming alcohol with enlisted personnel and later being driven home by them. There were also "multiple times that [Appellant] . . . ran into leaders, officers, [and] commanders, who were off-base at various bars and clubs [t]here in town with their enlisted members." Appellant explained these experiences shaped how he acted as a leader and interacted with his subordinates.

At trial, the Defense admitted six pictures in an off-duty setting of officer and enlisted personnel assigned to Malmstrom AFB. The pictures depicted officer and enlisted Airmen socializing and drinking alcohol in a home, inside a restaurant or bar, and standing outside a party bus. One picture showed Appellant with the vice wing commander (a colonel) of Malmstrom AFB, a senior enlisted member of the CRF, and a senior airman, all posing with a shot of alcohol in their hands. In response to a question posed to Appellant by his civilian defense counsel, Appellant acknowledged that he relied on the conduct depicted in the photos "to set the basis of [his] engagement with enlisted folks."

At one of the off-duty get-togethers at the home of a senior airman and his wife, the senior airman mentioned that he wished he could go to a professional boxing match in Las Vegas, Nevada. The conversation spurred Appellant to purchase air travel and hotel accommodations in Las Vegas for himself, the senior airman and his wife, and another senior airman. Appellant did so with the understanding that they would all pay him back. Because of a change in one of the senior airmen's duty schedule, Appellant bought new airplane tickets for the group. As soon as all four were available to travel, they took the same flights and shared a hotel room. When they learned that the price of admission to the boxing match was several thousand dollars, they went to a comedy show instead. The group spent the balance of their time drinking alcohol—with the exception of one senior airman who did not drink—and touring the city, including the Las Vegas Strip.

According to one Airman's testimony, before departing for Las Vegas, Appellant told them to lie on their leave requests and state that they were traveling to Salt Lake City, Utah, instead of Las Vegas. The senior airmen were concerned about lying, but Appellant rejected their suggestion that he should be the one to claim Salt Lake City as his leave location.[5] In the end, the senior airmen felt "pushed to go and put down Salt Lake City in the event" they "were caught . . . hanging out" with Appellant. The senior airmen understood that if they were caught, they would say that they drove from Salt Lake City to Las Vegas and "just happened to meet up" with Appellant.

In addition to the Las Vegas trip, Appellant and one of the senior airmen on the Las Vegas trip went on trips together to Billings, Montana, and Spokane, Washington. The senior airman drove them in his car to Billings where

---

[5] One of the senior airmen testified, "We suggested that it would be better if we just put down [Las] Vegas and [that Appellant] put down Salt Lake City. The reason being that . . . we didn't want to lie on our leave form." Appellant was not charged with soliciting the Airmen to commit an offense in violation of Article 134, UCMJ, or with making false official statements in violation of Article 107, UCMJ, 10 U.S.C. § 907, as a principal under an aiding and abetting theory. *See* Article 77, UCMJ, 10 U.S.C. § 877.

they shared hotel accommodations and ate at a restaurant. They also went to Spokane for a long weekend where they watched a movie and went to a comedy show. They all shared photos on social media with other Airmen in their group, including one photo that a senior airman captioned with Appellant's first name. When they were off duty, it was common for the Airmen to call Appellant by his first name, and Appellant never directed them to stop. The senior airman testified Appellant "didn't want other people knowing" about these trips, and it was not a generally accepted practice in his unit for lieutenants to go on personal trips with junior enlisted Airmen and NCOs. Appellant told the Airmen not to post photos of them hanging out together on social media. At trial, the Prosecution admitted pictures showing Appellant with junior enlisted members of the CRF in the back of a car and at locations around Las Vegas. Other pictures depicted Appellant and an enlisted member of the CRF relaxing in chairs at a movie theater.

Appellant denied feeling guilty or wrong about traveling off duty with his subordinates. When asked by his counsel if he "ever believe[d] that [his] conduct and traveling with [his] troops impacted the good order and discipline in the CRF," Appellant replied, "No sir, I did not." Appellant also denied that he told subordinates to falsify their leave requests to Salt Lake City, explaining "[t]hey did that on their own." However, he acknowledged "it could raise speculation" if they had all requested leave to Las Vegas. He also admitted that his trips with enlisted personnel might have been met with disapproval if they were known by "anybody outside of the unit," meaning outside the CRF.

Appellant admitted he became especially close with the Airmen he led, and that they felt like family to him.[6] One year before Christmas he bought watches as gifts for the Airmen he "socialized with the most in CRF." He also "gave gifts to many other troops for the holidays." In Appellant's previous unit at Malmstrom AFB, he went on "group" trips that included enlisted personnel from his unit, but he did not socialize with them at their homes like he did when he was

---

[6] Appellant responded in the affirmative when asked by civilian defense counsel, "Do you feel that your unit was a family?" Appellant further explained that the members of his unit,

> were very cohesive, morale was high, there was always, you know, high fiving, there was always joking going around before the missions. The missions were, they were exciting. When we came back I always used to tell them, you know, we put another one on alert for the day, we kept our alert rate type deal. You know, we were doing well.

Appellant elaborated, "Every unit that I've had the pleasure of leading, I have always treated that like family."

in the leadership position of the CRF.

### 2. Customs of the Service

After the Prosecution rested its findings case, the Defense moved under R.C.M. 917 for a finding of not guilty to the five specifications under Charge III. The Defense claimed the Prosecution presented no evidence of any customs of the Air Force that officers shall not fraternize with enlisted personnel on terms of military equality. The military judge did not rule on the motion, but he allowed the Prosecution to reopen its case and call Captain (Capt) JB who, like Appellant, had commissioned through the ROTC.[7] Capt JB was commissioned in October 2011 and had served almost eight years on active duty. Since arriving at Malmstrom AFB in August 2017 he had been assigned as the Operations Officer to the 341st Security Forces Squadron. In two previous assignments he was a flight commander, officer in charge, and operations officer for a security forces squadron, followed by duty as a ROTC instructor. He had also deployed to countries in West and Southwest Asia.

Trial counsel asked Capt JB if he had "been exposed to common Air Force training, just kind of as [he had] gone about [his] duties." Capt JB replied he had "experienced the whole magnitude of hands-on training," including "a wide range" of computer-based training, "lectures," and the like. Alluding to the question about common Air Force training, Capt JB acknowledged in general terms that he had "[a]bsolutely" participated in ROTC training and "similar training that's been incorporated ever since [he] joined in ROTC that [he] still s[aw] in play in the Air Force today."

After establishing Capt JB's background, trial counsel asked Capt JB if he was "also familiar, just generally, with the customs of [the] United States Air Force by virtue of [his] eight years['] experience?" He again replied, "Absolutely." Over defense objection, trial counsel asked Capt JB to give his opinion whether there was a service custom in regards to fraternization between officers and enlisted personnel:

> Q [Trial Counsel]. Is it a custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality?

---

[7] The Defense argued the Prosecution failed in its "obligation to present some evidence . . . from a knowledgeable witness subject to cross-examination, about the custom of the service that was violated in the notion of the fraternization that took place." The military judge indicated he believed the evidence did not reasonably tend to establish a custom of the service existed, and allowed the Prosecution to reopen its case. Over defense objection, the Prosecution called Capt JB who was not on its witness list, but had been identified by the Defense as a witness in its case.

A [Capt JB]. I would agree that it is a custom and a tradition that has been ingrained, at least in me, and it started in ROTC, and when I came back as [a] ROTC instructor from my second assignment, that was part of the curriculum which we strongly pushed into the cadets. But there were a multitude of other topics that we would cover.

Q. Okay. Thank you very much, Captain [JB]. Sir, that's all I have.

On cross-examination, the Defense probed the foundation and substance of Capt JB's knowledge of service customs at far greater depth than trial counsel had explored on direct examination. Capt JB answered affirmatively to the question whether, from an officer's perspective, the custom against fraternization differed from one command to another:

Q [Civilian Defense Counsel]. With regard to the custom of the service to not fraternize with enlisted from an officer's perspective, the custom that you know of defines that which is fraternization differently, depending on the facts and circumstances of that command, correct?

A [Capt JB]. I would agree. Especially as [a] ROTC instructor, there's a lot of situational constraints that go into a lot of the case studies and things that I would teach, as far as what's the borderline between fraternization and/or being a good leader. And so that was a thing that we would always look at and it wasn't always cut and dry, I guess.

The Defense then asked if there was a service custom against officers drinking with enlisted personnel:

Q [Civilian Defense Counsel]. With regard to the custom of the service in terms of fraternization with regard to the consumption of alcohol, is there a black and white custom that you know of?

A [Capt JB]. As far as, you know, a specific ["]this is something you should or shouldn't do,["] I know my own personal opinions and where my own standards . . . .

The civilian defense counsel interjected, explaining that the question did not seek to elicit the "rules that [Capt JB] set for [him]self." Rather, the Defense was "asking for opinions of the actual customs of the service," "something black and white or something that is marked in stone, so to speak; a real custom." Capt JB responded with slightly more specificity, but was initially non-responsive as regards a service custom against officers drinking alcohol with enlisted personnel:

> I can start to go back and recall specific things, such as you won't be in the same—you can't live in the same dwelling. You can't, you know—there's certain financial things that you can't do. So there is kind of a laundry list. I can't recall them all right now, but these are things you should or shouldn't do.

Specifically in regard to officers in the Air Force consuming alcohol with enlisted personnel, Capt JB again referenced his experience as a ROTC instructor and his personal opinions. He continued,

> When you bring in[to] the conversation[,] alcohol, it becomes what I would say one of those situations that was a good case study to have when they were growing up. As far as there's more of a spectrum where, and people's opinions are probably going to vary, what the standard is or what should be expected. I tend to be maybe a little more on the stringent end where I would not–I have rarely gone out, if I do go drinking, I will keep it, one, to a couple beers, and that's it. Never to a point where I would probably become too loose, I guess. But there may be other people that see that differently, and depending on what was impressioned [sic] on them might think that they can pull that spectrum a little far to the other side. That's, again, why we're taught all this stuff in ROTC. You know, the by the book answer. You get on active duty and that's again where I'll relay it's really important for those leaders to guide and mentor and direct those junior [enlisted] Airmen . . . to stay on the right path.

On further cross-examination, Capt JB acknowledged that "[w]ith regard to the customs of an officer and enlisted interacting on terms of military equality," that can be "a more difficult custom to define for a younger officer." Capt JB elaborated,

> I would imagine, [it can be] more difficult to understand sometimes where that line should be. In Security Forces, it's a career field that I was told when I got in [that] it's a little bit trial by fire. When you come in, you're in charge of a lot of enlisted personnel. A lot of them are your peers. The instruction I was given is, you know, that the Airmen are probably going to be older than you out there, but my leadership at that time told me the Senior Master Sergeant[ ]s listen to you, Tech Sergeants, but then, you know, below that, Staff Sergeants, Senior Airmen that you shouldn't really probably be hanging out with them too much, and rely on your senior NCOs for feedback and that mentorship to become a good officer.

Finally, the Defense asked Capt JB to "talk about the interplay between the idea of not fraternizing between an officer and enlisted [Airman] and the pressure to be a good leader on a young [l]ieutenant and how those two interact with regard to the custom of the service." Over trial counsel's objection, which the military judge overruled, Capt JB replied,

> So as a new [l]ieutenant coming to a Security Forces Squadron, there's probably been times the punch line of, you know, lead by example; be an assertive leader; take care of your troops; be compassionate; be kind; all of these things come into play and that's what develops you into the leader you are, and those first years as a [l]ieutenant, that's your development time. So how you interact with your peers, the Airmen, the people on your flight, you know, you'll probably rely on some of your previous life experiences up to that point. But now that you're actually in active duty and in charge of Airmen and how you interact with them should be always professional. But, you know, again, how you interact with them is—it's going to be different for every single officer, how you treat, and that's just the world of leadership and the art of the science of, you know, motivating people to accomplish the mission.

At the conclusion of cross-examination, the trial counsel asked no questions of Capt JB on re-direct examination, and the Government again rested its case.

**3. Law**

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Robinson*, 77 M.J. at 297–98 (quoting *Rosario*, 76 M.J. at 117). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

Considered together, the elements of fraternization in violation of Article 134, UCMJ, for which Appellant was convicted of Specifications 1 through 4 of Charge III, include that: (1) Appellant was a commissioned officer; (2) Appellant fraternized on terms of military equality with senior airmen by visiting Las Vegas, Nevada, Spokane, Washington, and Billings, Montana, for leisure; (3) Appellant then knew they were enlisted personnel; (4) such fraternization

violated a custom of the Air Force that officers shall not fraternize with enlisted personnel on terms of military equality; and (5) under the circumstances Appellant's conduct was to the prejudice of good order and discipline in the armed forces. *See MCM*, pt. IV, ¶ 83.b. Likewise, Appellant's conviction for Specification 5 of Charge III required the Government to prove elements (1) and (3) through (5). In addition, the Government had the burden to prove element (2) in that Appellant fraternized on terms of military equality with senior airmen by drinking[8] and socializing with them off-duty as equals.

Not all interactions between officers and enlisted personnel on terms of military equality violate the law:

> Whether the contact or association in question is an offense depends on the surrounding circumstances. The facts and circumstances must be such as to lead a reasonable person experienced in the problems of military leadership to conclude that the good order and discipline of the armed forces has been prejudiced by their tendency to compromise the respect of enlisted persons for the professionalism, integrity, and obligations of an officer.

*Id.* ¶ 83.c.(1).

In *United States v. Wales*, the United States Court of Military Appeals (CMA), the predecessor to our superior court, the United States Court of Appeals for the Armed Forces (CAAF), considered the legal sufficiency of two fraternization convictions. 31 M.J. 301 (C.M.A. 1990). The officer-appellant in *Wales* had engaged in a sexual relationship with an NCO on a military deployment. *Id.* at 302. The fraternization specifications in question alleged that the officer, an Air Force captain, met with the NCO in his room "for personal reasons," allowed her "to spend the night in his room," and "engag[ed] in acts of sexual intercourse with her," including when he was "sharing a hotel room with her" as they redeployed. *Id.* Both specifications alleged the officer's conduct was "in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality." *Id.*

As proof of a relevant Air Force custom at trial, the prosecution in *Wales* relied exclusively on a portion of a nonpunitive regulation of which the military judge took judicial notice. *Id.* at 308. However, the CMA found the appellant's convictions legally insufficient, concluding that "the prosecution did not adequately discharge its burden of proving the nature of the custom on which it relied to convict Captain Wales under Article 134[, UCMJ]." *Id.* at 309. The

---

[8] Appellant was charged with "drinking" as part of Specification 5 of Charge III. At trial and on appeal, counsel for both parties interpreted the charged conduct as consumption of *alcohol*, as do I, for purposes of this appeal.

CMA was "troubled that a 'custom' which is the basis for trying appellant for a crime authorizing the punishment of dismissal and 2 years' confinement was to be proved at trial by nothing more than a general statement in a nonpunitive regulation." *Id*. The CMA went on further to question whether judicial notice of such a statement was a proper substitute for testimony of a witness at trial:

> [I]f the Government wishes to prosecute fraternization on the basis of a custom in the military service, testimony must be offered by a knowledgeable witness—subject to cross-examination—about that custom. To require less is to allow the factfinder to make a determination that the custom exists without any indication on the record as to what that custom is.

*Id*. The CMA explained that the prosecution's burden is not lessened because it is required to prove a custom of the service as part of its proof: "In other cases, elements of a crime must be proved by evidence of record. Even though we realize that the crime of fraternization is unique to military society, this does not justify disregarding the customary procedural safeguards required by due process." *Id*.

After *Wales*, the CMA again found the Government's proof of an Air Force custom deficient in *United States v. Fox*, 34 M.J. 99 (C.M.A. 1992). The officer-appellant in *Fox* had engaged in a sexual relationship with a subordinate NCO in his chain of command. *Id*. at 100. The fraternization specification alleged that the officer, a male captain, traveled with the NCO to cities in Texas and Louisiana, where he was "sharing a motel room with her, engaging in sexual relations with her, and otherwise displaying undue familiarity towards her, in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality." *Id*. Evidence of custom that the Government relied on in its proof included this exchange with the NCO about the Air Force custom relating to fraternization:

> Q [Trial Counsel]. You're familiar with the military custom concerning fraternization?
>
> A [NCO]. Yes, sir.
>
> Q. What does fraternization mean to you?
>
> A. *It pretty much applies to the way in which an officer and enlisted personnel relate to one another and at what point does it cross a boundary of socializing and become fraternization.*
>
> Q. Now, in retrospect, looking at the relationship you and Captain Fox had during this period of time between February and June 1989, did you cross the bounds?
>
> A. Yes, sir.

14

*Id.* at 100–01.

The CMA found this testimony "d[id] very little to establish the nature and the perimeters of any Air Force custom," and "appear[ed] to be largely conclusory and circuitous on the point." *Id.* at 103 (opining "the testimony of the other witness on which the Government relies reveals it to be of little better quality"). The CMA continued its reasoning in *Wales* and found the appellant's conviction in *Fox* legally insufficient: "The Manual [for Courts-Martial] lists violation of 'custom' as an element of the offense. Likewise, a violation of 'custom' is alleged in the specification. The failure of the Government to prove adequately what the Air Force 'custom' was precludes us from upholding the findings of guilty as to fraternization." *Fox*, 34 M.J. at 103.

Consequently, when an appellate court evaluates the Government's proof of a service custom as it bears on the legal sufficiency of a fraternization conviction, its review includes whether the testimony of a knowledgeable witness establishes the nature of the custom on which the Government relied to convict. *Wales*, 31 M.J. at 309. The testimony of record must be such that a rational factfinder could determine "what that custom is." *Id.* If the evidence fails to "establish the nature and the perimeters of the custom," such as if witness testimony is "largely conclusory and circuitous on the point," then the Government's proof falls short of its burden and an appellant's conviction is legally insufficient. *Fox*, 34 M.J. at 103; *see also United States v. Shamess*, No. ACM 39434, 2019 CCA LEXIS 339, at \*29 (A.F. Ct. Crim. App. 23 Aug. 2019) (unpub. op.) (finding NCO's testimony sufficiently "concrete and specific" regarding a custom in the Air Force prohibiting sexual relations between officer and enlisted personnel).

### 4. Analysis

Appellant challenges the legal and factual sufficiency of his five fraternization convictions on grounds that the Government's proof of the fourth element—fraternization in breach of customs of the Air Force—was deficient. The gravamen of the fraternization charge here is that, in violation of customs of the Air Force, Appellant fostered off-duty bonds of association with junior enlisted Airmen with whom he had a superior-subordinate relationship. To prove its case, the Government was obliged to introduce evidence of particular service customs that Appellant had violated. While my esteemed colleagues would agree that the Government failed to introduce evidence of particular service customs that Appellant had violated as to Specifications 1 through 4 of Charge III, I agree with Appellant that the Government's failure of proof renders his conviction for all five specifications of Charge III and Charge III legally insufficient. Consequently, I do not reach the issue of factual sufficiency.

After the military judge allowed the Prosecution to reopen its case, Capt JB was called as a witness and testified he was familiar with customs of the Air Force. Trial counsel asked, "Is it a custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality?" Capt JB answered in the affirmative, but neither the leading question nor his response elicited actual customs, much less the specific customs Appellant was charged with violating. Notably, on cross-examination, Capt JB acknowledged the custom he was referring to differed "depending on the facts and circumstances of that command" within the Air Force, which is antithetical to the Government's burden to prove Appellant violated a *service* custom.

The Government argues in this appeal that testimony Capt JB provided "of the greater custom also proved the lesser, more specific custom in Appellant's case," and that "the [G]overnment met its obligation of notice in the charge and its burden of proof through Capt JB's testimony." The Government contends that it met its burden through Capt JB's testimony that service "custom" had been fixed in him as a ROTC cadet and endured as part of the curriculum when he was a ROTC instructor. But even this testimony is problematic as a matter of the Government's proof. Early in cross-examination, Capt JB volunteered that as an instructor, he would teach "the borderline between fraternization and/or being a good leader," and yet "it wasn't always cut and dry."

Among the problems with the Government's reliance on Capt JB's testimony is that the prohibition that officers shall not fraternize with enlisted persons on terms of military equality is illusory if it is not accompanied by evidence of a custom that applies across all commands within a service. *See Fox*, 34 M.J. at 103. There are innumerable instances in which an officer and enlisted personnel might interact as equals, even socialize, without the officer violating time-honored bounds of association. Under the Government's interpretation of service custom that it advances in this appeal, virtually all associations on terms of military equality, without more, raise the specter of improper behavior.

To further illustrate this point, Airmen of all ranks might attend holiday parties, weddings, or like ceremonies, celebrate a personal or shared achievement, engage in conversation at the commissary about their families, sit together at a religious service, and travel on morale, welfare and recreation trips, among many other interactions. It is only when these and other associations on terms of military equality are shown beyond a reasonable doubt to have violated *custom* that they may constitute fraternization in violation of Article 134, UCMJ. *Cf. United States v. McCreight*, 43 M.J. 483, 485 (C.A.A.F. 1996) (concluding "[t]here are appropriate circumstances for officers and their enlisted subordinates to socialize").

16

But the evidence that the Prosecution admitted through Capt JB's testimony on direct examination was no more definite than the NCO's testimony in *Fox*, and failed to "establish the nature and the perimeters of the custom," because it was "largely conclusory and circuitous on the point." *Fox*, 34 M.J. at 103. As the CMA found in *Wales*, the Government in the instant case "did not adequately discharge its burden of proving the nature of the custom on which it relied to convict." 31 M.J. at 309. Nonetheless, the Government contends that in addition to Capt JB's testimony, other evidence including the testimony of junior enlisted Airmen with whom Appellant regularly socialized, and Appellant's own testimony, reveal the existence of relevant service customs and their violation. I examine this evidence as it bears on each of the customs that the Prosecution had the burden to prove in its case, and disagree with the Government's contentions.

### a. Leisure Travel–Specifications 1–4 of Charge III

The custom of the service the Government alleges Appellant violated in Specifications 1 through 4 of Charge III was that officers abstain from leisure travel with enlisted personnel. However, Capt JB's testimony on direct examination did not provide any evidence of this custom and his testimony on cross-examination on this point was no more revealing.

The Government points to Appellant's testimony that shows Appellant understood the difference between "group" trips that Appellant believed were acceptable when Appellant was assigned to a different unit at Malmstrom AFB on the one hand, from prohibited personal trips with two senior airmen on the other. At the same time, the Government explains Appellant "acted as an equal in traveling with his subordinates, buying plane tickets, taking the same flight, sharing a single hotel room, going to a comedy show, and drinking alcohol, among other activities." One enlisted Airman took photos of Appellant, captioning it with Appellant's first name. The Government argues that Appellant knowingly and wrongfully acted as an equal with his subordinates, and the evidence shows Appellant's actions compromised their respect for the professionalism, integrity, and obligations of an officer. But, if Appellant's interactions with subordinates violated a custom of the Air Force, it was incumbent upon the Government to present proof and not merely claim a custom was violated because of the effect a violation of some unproven standard may have had on good order and discipline.

The Government similarly contends Appellant was aware that his actions were contrary to custom, and thereby sufficed as proof. The Government relies on evidence of Appellant's admissions that he told subordinates that "it could raise speculation" for them to all request leave to the same location and that Appellant acknowledged on cross-examination that his trips with enlisted personnel "would cause concern." Indeed, Appellant's consciousness of wrongdoing

is evident from his urging two senior airmen to lie on their leave requests. One Airman testified he could not remember the exact words Appellant used, just that Appellant explained to him that putting a different location on the leave request "would have been easier[,] with [Appellant] being an officer."

To be sure, evidence of Appellant's furtive behavior showed consciousness of wrongdoing, but that is not the same as establishing a service custom and its violation. When the Government undertakes to rely on *service* custom instead of an order, regulation, instruction, policy, or duty to prove that conduct is forbidden, the Government must prove beyond a reasonable doubt that a service custom exists and its violation. On this record, the Government has not shown that Appellant recognized his conduct and the fraternal bounds of association he formed with enlisted personnel breached service custom, and not some other standard or expectation. While the evidence indicates Appellant "didn't want other people knowing" about these trips, and so Appellant may well have understood his conduct violated his commander's expectations, or, perhaps, that it was contrary to a custom within Air Force Global Strike Command or The Twentieth Air Force,[9] it is not a reasonable inference that Appellant's behavior established proof of a custom of the *Air Force* and its attendant violation.

I find applicable the CMA's continuation in *Fox* of its reasoning in *Wales*: "The Manual lists violation of 'custom' as an element of the offense. Likewise, a violation of 'custom' is alleged in the specification. The failure of the Government to prove adequately what the Air Force 'custom' was precludes us from upholding the findings of guilty as to fraternization." *Fox*, 34 M.J. at 103. Thus, and for this reason, I find the Prosecution's failure of proof of Specifications 1 through 4 of Charge III precludes this court from upholding the four findings of guilty as legally sufficient.

### b. Drinking and Socializing Off-Duty as Equals--Specification 5 of Charge III

As to Specification 5, the Government claims that proof of Appellant's conviction is sufficient because the record shows Air Force custom prohibits officer and enlisted personnel from drinking and socializing off-duty as equals, and that Appellant violated the custom. The Government again contends that Capt JB's testimony established an adequate foundation for the Air Force custom, which, combined with the other evidence in the case, met the Government's burden of proof beyond a reasonable doubt. I am not persuaded.

---

[9] Appellant's court-martial was convened by the commander of The Twentieth Air Force, a numbered air force subordinate to Air Force Global Strike Command.

The Government again relies on Capt JB's statement about a custom of the Air Force that officers shall not fraternize with enlisted members on terms of military equality. In addition, the Government relies on Capt JB's testimony about "a spectrum" of appropriate behavior when it comes to drinking alcohol and socializing. Without distinguishing off-duty from on-duty interactions between officers and enlisted personnel—or his personal opinion on the one hand from service custom on the other—Capt JB opined that officers "shouldn't really *probably* be hanging out with [enlisted personnel] *too much.*" (Emphasis added). He later elaborated that an officer's "interact[ion] with [enlisted personnel] should be always professional," and that "how you interact with them is . . . *going to be different for every single officer,*" explaining, "that's just the world of leadership and the art of[, and] the science of, . . . motivating people to accomplish the mission." (Emphasis added). The Government also contends that the existence of the custom and Appellant's awareness of it is evident from Appellant's testimony that in his previous unit at Malmstrom AFB, he did not go to the homes of enlisted personnel. Appellant also described how his unit in AETC was "very strict." It follows, the Government contends, that "Appellant knew and understood his conduct was not appropriate under Air Force custom."

Considering Capt JB's testimony together with Appellant's, there is insufficient evidence to establish the nature of the custom upon which a rational factfinder might rely to convict. *See Wales*, 31 M.J. at 309 ("[I]f the government wishes to prosecute fraternization on the basis of a custom in the military service, testimony must be offered by a knowledgeable witness."). The testimony of record must be such that a rational factfinder could determine "what that custom is." *Id.* Capt JB explained he had his "own personal opinions" and knew his "own standards" about drinking with enlisted personnel but volunteered "there may be other people that see that differently." At best, the Prosecution established through his testimony that if there were a customary prohibition that officers shall not drink alcohol and socialize with enlisted personnel, that it would depend on the officer and the situation; at the very least, Capt JB raised doubt there was such a custom in the Air Force. To be clear, no rational factfinder could rely on Capt JB's testimony to determine "what that custom is," *id.*, much less whether, in the situation here, the custom germane to Appellant had been violated.[10]

---

[10] In *United States v. Shamess*, we observed that "custom" is a "habitual practice or course of action that characteristically is repeated in like circumstances." No. ACM 39434, 2019 CCA LEXIS 339, at *44 (A.F. Ct. Crim. App. 23 Aug. 2019) (quoting "Custom," BLACK'S LAW DICTIONARY (6th ed. 1990)).

My dissenting colleague, Judge Richardson, finds Appellant's testimony on cross-examination established some evidence on which the members could find legally sufficient evidence of a custom of the Air Force. I disagree. When trial counsel asked Appellant the compound question whether in ROTC he was taught the "lesson to not fraternize with enlisted Airmen in the way that you eventually did," Appellant agreed "[they] covered that curriculum at some point in ROTC." Neither the answer nor the colloquy between trial counsel and Appellant are sufficiently detailed to allow a permissible inference of service custom:

> Q [Trial Counsel]. And surely just as [Appellant's ROTC instructors] taught [Capt JB], they taught you not to fraternize with enlisted members in the way that you did, correct?
>
> A [Appellant]. *I won't say that sir, no.*
>
> . . .
>
> Q. . . . And you're telling me that when you were brought up through [college] ROTC, [one particular ROTC instructor] and other instructors didn't teach you this lesson to not fraternize with enlisted Airmen in the way that you eventually did?
>
> A. I'm not saying that was not part of the curriculum, yes sir, we covered that curriculum at some point in ROTC. *To the extent of in the way that I did, I believe it's open to perception*.

(Emphasis added).

Appellant's testimony failed to fill the gap in the Prosecution's proof and, like the evidence in its case-in-chief, and in *Fox*, "d[id] very little to establish the nature and the perimeters of any Air Force custom," and was "circuitous on the point." 34 M.J. at 103.

Judge Richardson points out that junior enlisted Airmen with whom Appellant regularly drank alcohol and socialized were skeptical and uncomfortable with Appellant's conduct. This fact evidences wrongdoing in violation of some standard, but no rational trier of fact could have found a *service custom* that Appellant may have violated. Judge Richardson also makes the point that the custom at issue in *Wales, Fox*, and *Shamess* all "involved one act fairly easy to define" (sexual intercourse), unlike the "multiple potential acts," which define the custom at issue here. It is precisely because the lawfulness of officer-enlisted interactions depend on custom that the prosecution has a duty "to draw a line as to where acts of fraternization or association with enlisted men [and women] by officers cease to be the innocent acts of comradeship and normal social [relationships] between members of a democratic military force and become a violation of Article 134 of the Code . . . ." *United States v. McCreight*,

39 M.J. 530, 533–34 (A.F.C.M.R. 1994) ("[W]e do not hold today that officer supervisors commit criminal fraternization merely by drinking or visiting with enlisted subordinates in social settings. This case rests on its own unique facts."), *aff'd*, 43 M.J. 483, 485 (C.A.A.F. 1996).

Considering Appellant's testimony along with all other findings evidence about officers, including Appellant, drinking alcohol and socializing with enlisted personnel, the Prosecution failed to present evidence "offered by a knowledgeable witness—subject to cross-examination—about that custom." *Wales*, 31 M.J. at 309. I find the Prosecution failed to "establish the nature and the perimeters" of the custom at issue, *Fox*, 34 M.J. at 103, and thus the evidence on which it relied to convict is legally insufficient. Additionally, Appellant's testimony comparing the strict rules he followed in a different command in the Air Force with his experience at Malmstrom AFB fell short of proof of a *service* custom.

I harbor little doubt that Appellant's conduct resulted in the appearance of partiality and was prejudicial to good order and discipline. Although the Defense presented evidence to the contrary, Appellant denigrated his status as a leader and instead assumed that of a friend. To this end, I agree with this observations by a former judge on the Air Force Court of Military Review,

> Anyone who believes that a leader can mechanically assign a "friend" to unpopular or hazardous duty is unrealistic. Axiomatically, the troops will be highly aware of the duties assigned to an enlisted person(s) with whom an officer habitually associates or consorts. That is the prejudice to good order and discipline which the line between ranks is meant to prevent; and an officer and a gentleman will endeavor to keep oneself [sic] on the appropriate side of that line.

*McCreight*, 43 M.J. at 485 (quoting *United States v. Johanns*, 17 M.J. 862, 872 (A.F.C.M.R. 1983) (Snyder, J., concurring in part and dissenting in part)). But even as the CAAF's *McCreight* decision observed in dicta that "[s]ince Revolutionary War days, it has been considered unlawful for officers to drink alcohol with enlisted men in public places and to treat them on terms of military equality," the CAAF did not absolve the Government of the condition of proof. *Id.* (finding evidence sufficient to sustain fraternization conviction because "[t]hree of the government witnesses in this case testified about the custom and tradition in the Air Force against fraternization").

The fact that officers are held to a higher standard of conduct does not diminish the Prosecution's burden.[11] *United States v. Appel*, 31 M.J. 314, 320 (C.M.A. 1990) ("[A] custom is not a subject for judicial notice . . . . With respect to the Air Force custom against fraternization . . . no one can say . . . that the extent of this custom is so clear as to dispense with the requirement of proof."). The standard for legal sufficiency requires this court "to consider the evidence in the light most favorable to the Government, and to determine whether the evidence provides a sufficient basis upon which rational factfinders could find all the essential elements beyond a reasonable doubt." *United States v. Holt*, 52 M.J. 173, 186 (C.A.A.F. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Robinson*, 77 M.J. at 297–98; *Rosario*, 76 M.J. at 117; *Barner*, 56 M.J. at 134.

In reaching this result, I considered the Government's argument on appeal that "significant differences lie between the official, sanctioned, inclusive social functions of [Appellant's] senior leaders and his own unofficial, unsanctioned, exclusive gatherings at [A]irmen's homes." However, the Prosecution presented no evidence that service custom differs based on rank or position, or that "official, sanctioned, [and] inclusive" interactions are permitted, and that "unofficial, unsanctioned, [or] exclusive" ones are not. This court need not decide whether, and to what extent, the offense of fraternization as enumerated in Article 134, UCMJ, countenances that the offense of fraternization may depend on the rank and position of the officer or, for that matter, on the rank and position of the enlisted member with whom the officer interacts on terms of military equality. Consequently, I do not accept the Government's invitation in the case under review to find that senior officers may be held to a different standard because their interactions with enlisted personnel may convey the imprimatur of an official, sanctioned, or inclusive gathering.

In the absence of evidence, I cannot discount that the members applied their individual beliefs about service customs to convict Appellant of the five specifications of fraternization under Charge III and Charge III. Consequently, I find Appellant's conviction for Specification 1 through 5 of Charge III, and Charge III, legally insufficient. Because of this conclusion, the next issue is whether I would reassess Appellant's sentence. This court has broad discretion to reassess a sentence to cure error. *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013). This court may reassess a sentence only if able to reliably determine that, absent the error, the sentence would have been "at least of a

---

[11] A Court of Criminal Appeals may "take judicial notice of an undisputed fact or question of domestic law that is important to the resolution of an appellate issue, [but] it cannot take judicial notice of facts necessary to establish an element of the offense." *United States v. Paul*, 73 M.J. 274, 280 (C.A.A.F. 2014).

certain magnitude." *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000) (citation omitted). Applying the factors enumerated in *Winckelmann*, I am not convinced this court can reliably make such a determination. *Winckelmann*, 73 M.J. at 15–16. Accordingly, I would set aside rather than reassess the sentence. Considering this determination together with the decisions of my esteemed colleagues, this opinion further addresses the impact of this conclusion of legal insufficiency in the court's decree.

**B. Factual Sufficiency Determination for Conduct Unbecoming an Officer (Specification 1 of Charge II) and Abusive Sexual Contact of CP (Specification[12] of Charge I)**

Before the court-martial was assembled, just one specification remained under each of Charges I and II. Appellant contends that his conviction for conduct unbecoming an officer by touching JA's penis through his clothing, as charged in the remaining specification of Charge II, is factually insufficient. Appellant also contends that his conviction for abusive sexual contact of CP by touching his genitals through his clothing, as charged in the remaining specification of Charge I, is factually insufficient. Joined by Judge Richardson, I have examined the evidence of record underlying both convictions and we find both specifications legally and factually sufficient.[13]

**1. Additional Background**

In October 2017, Appellant along with other security forces Airmen assigned to Malmstrom AFB drove to an out-of-state location for a week of annual training. The trip was planned as a two-day drive so Appellant and the others stopped overnight before continuing to their destination the next day. When the group arrived at their stopover point they checked into a hotel and had dinner. After dinner, a group of six Airmen including Appellant and another company grade officer, CP, and four NCOs went to a bar where they consumed alcohol until the bar closed. CP was junior in grade to Appellant and was shadowing Appellant to become an assistant convoy commander. JA was among the four NCOs who went to the bar. JA was assigned to the CRF and Appellant

---

[12] After arraignment, the Government withdrew and dismissed two specifications under Charge I enumerated as "1" and "3," leaving a single specification, which alleged a violation of Article 120, UCMJ, 10 U.S.C. § 920. Thereafter, counsel for the parties and the military judge referred to the remaining specification as "1" or "the Specification" of Charge I. The members were instructed and entered findings on "the Specification."

[13] For both convictions, Appellant casts the issue as factual insufficiency. However, to the extent that Appellant's brief addresses claims about the Government's failure of proof, Judge Richardson and I find these convictions legally sufficient as well.

was his flight commander.

JA spent part of the evening talking to several women, and then danced with one of the women before introducing her to the Airmen at his table. After the woman left, Appellant "nut-tapped" JA by touching his genitals through his clothing,[14] and jibed, "You won't use that tonight." JA replied that he "will" and took Appellant's conduct as a harmless joke. JA testified they were all "pretty drunk" and Appellant's level of intoxication was "right there with [them]; pretty drunk."

As members of the group left the bar, they made their way to their van to return to the hotel. While the others were leaving or talking outside the van, JA took the bench seat in the far back and was the first to sit down. Appellant was next to get in the van and crawled on his knees in the aisle by the bench seat where JA sat. JA testified that while Appellant was "on his knees in the aisle," Appellant grabbed JA's hand and pulled himself closer. Appellant was "super close . . . kind of like face-to-face," or "cheek-to-cheek," and told JA, "'I'll bet you a hundred dollars you don't use this tonight,' and [Appellant] grabbed [JA's] nuts" through his clothes. Later in the trial, Appellant acknowledged on cross-examination that he told JA, "I bet you a hundred dollars you won't use this." Appellant admitted making the statement and that "this" was in reference to JA's penis; however, he did not recall touching JA even as he conceded it was possible he did, but he did not remember.[15]

JA testified that he pushed Appellant away and quipped, "I got you. You better give me my hundred dollars." Appellant then came "back again," and this time Appellant "kind of put[ ] his hand behind [JA's] neck" and said either, "I want proof" or "You better show me the proof." JA testified that Appellant then "grab[bed JA's] penis" through his clothes. At the same time Appellant goaded that he "wanted a picture. He wanted a video; something." JA retorted, "Okay. You better have my hundred dollars tomorrow morning." JA then "pushed [Appellant] off again, [and] everybody else started jumping into the van." JA explained, "And that was, kind of it," and the group headed back to

---

[14] When discussing proposed findings instructions, trial counsel explained Appellant was not on trial for the conduct with JA in the bar. Trial counsel similarly explained in rebuttal argument that "[t]he United States does not allege that the nut-tap in the bar was criminal." As evident from testimony, this court understands "nut-tap" to mean using one's hand to tap a male's genitalia over (or through) his clothing.

[15] Trial counsel asked Appellant what he did with his hands. Appellant replied, "I cannot tell you what I did with my hands, sir." In a follow-up question Appellant denied touching JA. Appellant later acknowledged that it was possible he touched JA and that he did not remember. Appellant testified that "[t]o the best of [his] knowledge," he "did not touch" JA, but "when people are drinking" "everything" "is a possibility."

the hotel.

In response to a question by trial counsel, JA acknowledged that the situation at the end of the evening made him feel "a little bit" weird at the time. However, his testimony was dismissive of Appellant's conduct when the incident happened, explaining "he's my boy. Like, [it was] no big deal." On cross-examination, JA acknowledged he "never felt like [he] got assaulted" or "harassed" by Appellant, and that he "saw it all as a drunken joke."

CP also consumed a large amount of alcohol and was "[v]ery intoxicated" when the bar closed early that morning. He was among the group that got into the van with JA, Appellant, and the others. Because of the amount of alcohol CP consumed at the bar, at trial he expressed having a poor recollection of the evening and no memory of the ride back to the hotel. His next memory was standing in the hallway outside his second-floor room that was next to Appellant's room, and having a conversation with guests across the hallway. He testified that Appellant approached him "and said something along the lines of can you come here[?] I need to tell you something." Appellant "was standing . . . in his room" when he invited CP to enter. CP ended the conversation with the other guests, went into Appellant's room, and sat on the edge of the bed. On cross-examination, CP acknowledged he sat on the bed despite the availability of a chair.

CP testified he "remember[ed Appellant] standing across from [him], leaning up against th[e] counter . . . in front of the bed, and the next thing [he] remember[ed] [wa]s [Appellant] came in and kissed [him]" on the lips. He explained that Appellant "moved forward, over [him] on the bed," just before it happened. The kiss caught CP by surprise because he "didn't have any indication . . . [or] even know [that Appellant] was into [him] in that sense. [He] thought [they] were just friends at that point." CP explained he was expecting "just that [Appellant] wanted to tell [him] something in general when [they] went in the room," and "it was a very confusing moment and very sudden." CP also testified that as Appellant leaned over the bed, Appellant "took his hand and reached down [CP's] pants." CP was wearing fitted pants, a belt, and underwear and Appellant's hand went underneath his belt and touched his penis. CP typically did not wear his belt tight around his waist. Although he was certain Appellant touched his penis, he could not recall if Appellant's hand went on top of or beneath his underwear.

Trial counsel then had this exchange with CP, at which time CP volunteered he told Appellant he was not interested in Appellant in a sexual way:

> Q [Trial Counsel]. Were you wearing underwear?
>
> A [CP]. Yes, sir.

Q. I want you to correct me if I'm wrong, but is it fair to say that at least it was through your clothing?

A. I'm not sure what you mean, sir.

Q. Okay. But you know his hand was over your penis at that point in time?

A. Roger.

Q. *After he did this the first time, what happened?*

A. *I remember we had a conversation. I remember talking to him afterwards telling him sorry. I'm not into you. I'm not into that or anything like that.*[16] *I can't remember what else we talked about, but I know the incident happened again.*

Q. Tell me about how it happened again.

A. It was the same situation where Lieutenant Washington stepped over, kissed me on the lips and put his hand down again.

(Emphasis added).

CP testified he could not remember details of the conversation in the hotel room, but did recall that Appellant replied "it doesn't matter or something along those lines," and then Appellant gave as a reason that they both had girlfriends. CP recalled Appellant saying, "Let me suck you off," which CP understood to mean oral sex and he declined. CP did not immediately leave Appellant's room because he "felt like [he] addressed it, and [he] felt like [he] made it clear that [he] didn't want it," meaning he did not desire to engage in any sexual acts with Appellant. CP "didn't think" that Appellant would "do it again."

CP then described how Appellant reinitiated sexual contact and elaborated on his earlier testimony about how the "same situation" happened again. CP described how Appellant "stepped over" and again kissed him on the lips and put his hand down CP's pants. As before, Appellant's hand touched CP's genitalia, either over or beneath his underwear. CP testified he was shocked by this second incident and explained he had a difficult time reacting to Appellant's advances because his "intoxication level" affected his ability to respond. In plain words that described his condition at the time, he elaborated that "it's really hard to react to something like that when you're that drunk." CP

---

[16] We later address Appellant's contention that CP's testimony, "I'm not into you. I'm not into that or anything like that," implicated Mil. R. Evid. 412.

acknowledged the situation ended either because he succeeded in keeping Appellant away or because he told Appellant no. However, CP could not recall exactly how the situation came to a conclusion.

CP did remember returning to his room and calling his girlfriend whom he was in a long-distance dating relationship at the time, and who testified as a witness for the Prosecution. Without identifying Appellant by name, she testified that CP told her "that the person in question had attempted to kiss him and then touched him in an inappropriate way." She recalled that her boyfriend's description of the incident was "[v]ery vague, but [he] . . . told [her] generally what had happened." She testified he "was very upset," and the words she used to describe his demeanor during the phone call were "shocked," "concerned," "stressed," and he was "talking really fast." On cross-examination she explained that CP told her that after the attempted kiss, the other person then "put his hand on [CP's] leg or . . . put his hand on him," but she could not "remember exactly what [CP] said about . . . the specific placement." She acknowledged he told her the touching was "[s]omewhere" "[o]n his leg or knee" or "[i]n that general area." She did not remember CP saying "anything about this individual touching his private parts." They had been dating for about two and a half years at that point and they "didn't hide anything from each other." On redirect examination, she testified that CP was "very protective about [her] feelings" and so it would not surprise her if her boyfriend had been touched on the genitals and did not share that information with her.[17] Appellant testified that he did not put his hands down CP's pants, much less touch CP's penis at any point.

Later in the morning, CP answered a knock on the door, and Appellant stepped into the room. At trial, he recalled Appellant asking either, "Can we just not talk about what happened last night[?]" or, "Can we just put this behind us . . . and can we just not talk about it[?]" CP told Appellant he "was okay with it" in order to "kind of move[ ] past it, [and] just to quit talking about" what happened in Appellant's room. CP elaborated in his testimony that he and Appellant would be together for the entire week of temporary duty (TDY) and his "goal at that point" was "just . . . to avoid it and just move on and move past it." In response to a question by the trial counsel as to why he was willing to put the incident aside, CP explained, "I just wanted to get the rest of the TDY over with . . . and just move on. I didn't want to have that awkward conversation. I didn't want to continue to relive the event afterwards, and I also knew that . . . I could just avoid him and just stick to work."

---

[17] CP testified he withheld details of the incident from his girlfriend because he "was very intoxicated" and "that wasn't the intention of [his] call." He "just needed someone to talk to at that point," and "she was the person [he] felt comfortable telling about it."

Appellant's conduct with CP was not a subject of further discussion, and no evidence of record suggests that any other security forces personnel were aware at the time of any sexual conduct, much less nonconsensual acts, involving Appellant and CP at the hotel. Several months after the incident in question, in February 2018, CP mentioned aspects of what happened to a peer who was also a commissioned officer. The officer testified that he and CP were drinking beers as CP was preparing to depart for his next duty assignment. The officer mentioned that Appellant was heading to the same assignment as CP, which prompted CP to disclose that Appellant "at a TDY, after a night of drinking asked to see him privately in a hotel room. [Appellant p]ulled him in and asked to suck him off," which the officer understood to mean that Appellant offered to give CP "oral sex." No evidence of record suggests that CP disclosed in that February 2018 conversation with a peer that Appellant kissed him or that Appellant engaged in the charged conduct of touching CP's genitals through his clothing.

Appellant's conduct with CP came to the attention of military law enforcement when special agents of the Air Force Office of Investigation (AFOSI) were investigating other allegations against Appellant. After an AFOSI agent contacted CP at a deployed location, CP disclosed the incident with Appellant. Appellant's conduct with CP was the basis for his conviction for abusive sexual contact that was charged in the remaining specification of Charge I.

In contrast to CP's private disclosures to his girlfriend and, much later, to a peer about Appellant's conduct at the hotel, the incident between Appellant and JA in the van was a lively topic of conversation later the same day as the incident in question. When the Airmen arrived in the town outside their destination, a group that included Appellant and JA sat down for lunch at a restaurant where they reminisced and told stories about their evening. JA shared with the others, "Oh, yeah. [Appellant] was drunk. He grabbed my stuff last night." Others reacted in disbelief. JA recalled that "everybody was just like, 'What? That's frickin' crazy,'" but JA was again dismissive of Appellant's conduct, attributing the incident to the revelry and amount of alcohol they consumed at the bar. JA testified that he told the group, "Yeah, we were just drunk, you know," seemingly unconcerned about what had happened in the van. Appellant, who was listening to the conversation, remarked, "I can't believe I did that" and "I can't believe that happened."

Shortly after the group left the restaurant, Appellant texted JA, apparently concerned that others outside their group would learn about his conduct with JA in the van. JA recalled Appellant's message from his memory because the messages were no longer saved on his cell phone. JA testified that Appellant told him, "Hey, please don't say anything. I'm sorry. I didn't mean to do that. I was pretty drunk last night." JA texted back and told Appellant not to "worry

about it," explaining that he understood because "[w]e all get drunk sometimes and do dumb stuff." JA recounted that Appellant replied, "Please don't ever mention it again."

JA considered Appellant's conduct in the back of the van to be harmless fun until he learned about Appellant's behavior with other male Airmen who were assigned to the CRF. At trial, JA recounted how he learned about their stories from a senior airman who was aware of Appellant's behavior with other Airmen which caused JA to become "concerned about his friends." Subsequently, JA met with these Airmen who recounted individual incidents of Appellant's sexual behavior with each of them. JA explained, "as an NCO and supervisor, I knew that I had to tell somebody, and I wanted them to tell me, [be]cause I didn't want to assume anything. So I had a meeting with them." At trial, JA repeatedly characterized Appellant's behavior with him as "wrong," explaining that the incident "shouldn't have happened." Ultimately, JA reported Appellant's conduct to authorities and it was the basis for Appellant's conviction for conduct unbecoming an officer that was charged in the remaining specification of Charge II.

### 2. Law

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). Our assessment of whether a conviction is correct in fact, that is, factual sufficiency, is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)).

### 3. Analysis

#### a. Conduct Unbecoming an Officer by Touching JA

In order for Appellant to be found guilty of conduct unbecoming an officer as charged in the remaining specification of Charge II, the Prosecution was required to prove beyond a reasonable doubt that (1) on divers occasions Appellant did a certain act; and (2) under the circumstances, the act constituted

conduct unbecoming an officer. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 59.b. The "certain act" was that Appellant wrongfully and dishonorably touched JA's genitals through the clothing. Conduct in violation of Article 133, UCMJ, is "action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer." *MCM*, pt. IV, ¶ 59.c.(2). Citing Article 133, UCMJ, the military judge instructed the members,

> There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer cannot fall without seriously compromising the person's standing as an officer or the person's character as a gentleman. This article prohibits conduct by a commissioned officer which, taking all the circumstances into consideration, is thus compromising.

The military judge's instructions were substantially in accord with the explanation of the nature of the offense in *MCM*, pt. IV, ¶ 59.c.(2).[18]

The offense of conduct unbecoming an officer under Article 133, UCMJ, is a general intent crime. *United States v. Voorhees*, 79 M.J. 5, 16 (C.A.A.F. 2019). As such, "'criminal liability for [conduct unbecoming] does not depend on whether conduct actually effects a harm upon [a] victim,' but rather on whether the officer possessed the general intent to act indecorously, dishonestly, or indecently." *Id.* (alterations in original) (quoting *United States v. Caldwell*, 75 M.J. 276, 282 (C.A.A.F. 2016)) (additional citation omitted). "[G]eneral intent merely requires [t]he intent to perform [the actus reus] *even though the actor does not desire the consequences that result.*" *Id.* (quoting *United States v. Haverty*, 76 M.J. 199, 207 (C.A.A.F. 2017)) (alterations in original).

Characterizing Appellant's conduct with JA in the back of the van as horseplay with a subordinate, Appellant claims that conduct that is "universally understood to constitute a joke," without more, does not constitute an Article 133, UCMJ, violation. Appellant also contends it was only when JA "came to believe that [A]ppellant is homosexual," that his opinion about the incident changed. To that end, Appellant explains in this appeal that

---

[18] The Manual gives examples of Article 133, UCMJ, offenses, such as "being drunk and disorderly in a public place," and "committing or attempting to commit a crime involving moral turpitude." *MCM*, pt. IV, ¶ 59.c.(3).

status as a homosexual does not transform distasteful, but lawful horseplay into a criminal offense. The sexual orientation of the officer does not affect whether conduct constitutes a disorder or deviates from the standards expected of an officer. . . . Here, the only reason why [JA]'s opinion changed to hold that [A]ppellant's conduct was at all problematic was that he learned that [A]ppellant is homosexual.

We address this line of reasoning in light of the testimony of record and consider Appellant's points along with the evidence on which the Prosecution relied to convict.

The factual sufficiency of Appellant's conviction turns on whether we are ourselves convinced the Prosecution proved beyond a reasonable doubt that Appellant wrongfully and dishonorably touched JA's genitals through the clothing on divers occasions, and did so under circumstances that amounted to conduct unbecoming an officer. JA's testimony established that Appellant twice engaged in the charged conduct in the back of the van. Appellant admitted he told JA, "I bet you a hundred dollars you won't use this," and was clear that "this" alluded to JA's penis. At the same time, Appellant testified that to the best of his knowledge he did not grab JA's genitals. But Appellant also said it was possible he did, and that he just did not remember. We are dubious that Appellant's statements to JA would be complete without the physical contact essential to complete his wager, and credit JA's testimony—as did the factfinder—that Appellant twice touched JA's genitals through the clothing over Appellant's equivocal denial at trial.

Appellant's primary attack on the factual sufficiency of his conviction is that JA's insight about Appellant's intentions in the back of the van changed when he learned about Appellant's homosexual behavior with Airmen more junior than himself. What JA initially regarded as drunken horseplay, he later viewed as unwelcome conduct of a sexual nature. However, the record does not support Appellant's contention in this appeal that JA's opinion of Appellant changed when JA "learned that [A]ppellant is homosexual." The focus of trial, and JA's testimony specifically, was Appellant's conduct.[19] It was JA's status

---

[19] At the Defense's request, the military judge properly instructed the members:

[T]o the extent you believe the accused is homosexual or has engaged in homosexual conduct, such information is not a relevant consideration as to whether that makes him more likely to commit abusive sexual contact, engage in conduct unbecoming an officer and gentleman, or fraternize as charged in the specifications. You may not consider homosexual conduct in a more aggravating light than heterosexual

as a NCO and supervisor, and not Appellant's sexual orientation, that prompted JA to report Appellant's conduct in the back of the van when he learned about Appellant's sexual behavior with Airmen more junior than himself.

At the same time JA described Appellant's conduct with him as "wrong," testifying that the incident "shouldn't have happened," JA acknowledged he never felt like he was "assaulted" or "harassed." In this regard, we give little weight to JA's testimony about the extent to which Appellant's actions impacted him. As discussed previously, "criminal liability for conduct unbecoming does not depend on whether conduct actually effects a harm upon a victim, but rather on whether the officer possessed the general intent to act indecorously, dishonestly, or indecently." *Voorhees*, 79 M.J. at 16 (quoting *Caldwell*, 75 M.J. at 282) (internal quotation marks and alterations omitted). Appellant's conduct was unbecoming not just because of JA's perception after the fact that it was wrong, but because the evidence showed Appellant wrongfully and dishonorably touched another Airman's genitals.

The record shows Appellant "possessed the general intent to act indecorously, dishonestly, or indecently." *Id.* Appellant himself demonstrated he understood the wrongful and dishonorable nature of his conduct later the same day it occurred. Upon hearing JA telling others about the incident while they were eating lunch, Appellant remarked that he could not believe he "did that" and "that happened." Appellant's reaction demonstrates he recognized the wrongfulness of his conduct after it happened. His apology in texting JA demonstrated consciousness of guilt and Appellant's excuse of intoxication had no bearing on the Government's proof. *See United States v. Hensler*, 44 M.J. 184, 187 (C.A.A.F. 1996) ("Voluntary intoxication is not a defense to a general-intent crime."); *see also United States v. Gonzales*, 78 M.J. 480, 486 (C.A.A.F. 2019) ("[V]oluntary intoxication cannot prevent the formation of the general intent to commit rape.") (citing *United States v. Brown*, 43 M.J. 187, 189 (C.A.A.F. 1995)); *MCM*, pt. IV, ¶ 35.c.(6) ("'Drunk' means . . . any intoxication which is sufficient to impair the rational and full exercise of the mental or physical faculties."). The evidence leads this court to conclude that Appellant engaged in behavior in a private capacity that had the effect to dishonor and disgrace him personally and at the same time seriously compromise his standing as an officer. *See MCM*, pt. IV, ¶ 59.c.(2).

---

conduct for purposes of determining whether the accused's conduct was wrongful and dishonorable, unbecoming of an officer, service discrediting, or prejudicial to good order and discipline.

In the absence of evidence to the contrary, we presume members follow a limiting instruction. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted).

Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt of the remaining specification of Charge II beyond a reasonable doubt. Thus, we find Appellant's conviction is factually sufficient.

### b. Abusive Sexual Contact of CP

As charged in the remaining specification of Charge I, the Prosecution had to prove beyond a reasonable doubt three elements: (1) Appellant committed sexual contact upon CP by touching his genitals through the clothing; (2) Appellant caused bodily harm to CP by touching CP in that manner; and (3) Appellant did so with the intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 45.b.(7)(b). "The term 'bodily harm' means any offensive touching of another, however slight, including any . . . nonconsensual sexual contact." Article 120, UCMJ, 10 U.S.C. § 920(g)(3).

Unlike the conduct unbecoming offense involving JA, which required the Prosecution to present evidence that Appellant possessed the general intent to act indecorously or indecently, in the instant offense involving the same charged acts with CP, the Prosecution had the burden to prove Appellant's specific intent in touching CP's genitals through the clothing was to gratify his own sexual desire.

The statutory definition of "consent" explains,

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

Article 120(g)(8)(A), UCMJ, 10 U.S.C. § 120(g)(8)(A); *see also MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The definition further explains that "[l]ack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." Article 120(g)(8)(C), UCMJ, 10 U.S.C. § 120(g)(8)(C); *see also MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

On appeal, Appellant attacks the reliability of CP's memory, questioning how CP could recall the charged conduct in the hotel room and yet "claim[ ] not to remember surrounding circumstances, including who bought drinks for whom, what [CP] did while he was at the [bar], or what others did." Appellant

also challenges CP's veracity in that CP's account of what happened when he told his girlfriend did not include any reference to genital touching. Instead, that account was much like one he later gave to another Air Force officer in which he also failed to mention the charged genital touching. Appellant claims that CP's disclosures reveal a "motive to exaggerate the evening's events" and "to transform an ill-advised consensual encounter into a non-consensual one." Appellant also claims this court "cannot be convinced beyond a reasonable doubt that [CP]'s subsequent addition of the alleged genital touching to his version of the night's events was not because he needed to establish his heterosexual bona fides in order to protect his relationship" with his girlfriend.

The factual sufficiency of Appellant's conviction for abusive sexual contact turns on whether we are ourselves convinced the Prosecution proved beyond a reasonable doubt that CP's testimony that Appellant touched his genitals through the clothing without his consent was credible, and that Appellant did so with the intent to gratify his own sexual desire. We find CP's testimony about Appellant's conduct at the hotel was convincing and established the elements of the charged offense beyond a reasonable doubt.

Even though CP was "[v]ery intoxicated," he was certain Appellant twice[20] touched his penis either over or beneath his clothing without consent. The groping itself was sexual in nature and the circumstances further showed Appellant intended to gratify his sexual desire because of the unwelcome kissing that preceded it and because Appellant offered to perform oral sex on CP after CP rebuffed Appellant's advances. We find under the circumstances that Appellant did not have CP's freely given consent to engage in sexual conduct with Appellant. Additionally, the evidence shows Appellant initiated an "offensive touching of another, however slight." Article 120(g)(3), UCMJ. Thus, the Prosecution proved bodily harm as both an offensive touching and a nonconsensual sexual contact beyond a reasonable doubt.

Appellant asserts CP's testimony is unreliable because it was inconsistent and riddled with selective memories. However, we are not persuaded that we should discount salient details about Appellant's sexual contact in the hotel room because CP had marginal memory and recall of events at the bar and remembered nothing about the van ride back to the hotel. The evidence of record demonstrates that Appellant's kissing and groping CP caught CP by surprise. Appellant's conduct so startled CP that later, after leaving Appellant's room, it prompted him to call his girlfriend who testified credibly about the distress she heard in CP's voice as he explained that he had been touched inappropriately.

---

[20] Appellant was charged with abusive sexual contact, but not on divers occasions.

We decline Appellant's suggestion to find CP's testimony of a startling event less believable because other more trivial events that happened at the bar were less memorable. We also decline to find CP's testimony unbelievable because CP withheld details of Appellant's sexual advances from his girlfriend and from a peer before disclosing the incident in question to special agents of the AFOSI. The information CP did disclose corroborates his testimony that Appellant's sexual advances in his hotel room were unsettling and unwelcomed. Appellant's argument regarding CP's motive to exaggerate is also unpersuasive. If CP was concerned about establishing "his heterosexual bona fides" with his girlfriend because something sexual and consensual occurred, as Appellant claims in this appeal, then CP likely would not have reported anything at all.

We have considered the discrepancies and motives advanced by Appellant. Testimony "need not be completely consistent to still be sufficiently reliable to sustain a conviction, and we do not confine our analysis to merely the testimony of a single witness in performing our factual sufficiency review under Article 66, UCMJ." *United States v. McFadden*, No. ACM 38597, 2015 CCA LEXIS 520, at *11 (A.F. Ct. Crim. App. 18 Nov. 2015) (unpub. op.); *see also United States v. McElhaney*, 50 M.J. 819, 832 (A.F. Ct. Crim. App. 1999) (concluding evidence was factually sufficient, in part, because the appellant's wife corroborated his romantic relationship with the victim notwithstanding the appellant's claim that the victim's testimony was both implausible and inconsistent).

While we have the independent authority and responsibility to weigh the credibility of witnesses in determining factual sufficiency in our review, we recognize that the trial court saw and heard the testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (stating it is the members' role to determine whether testimony is credible or biased). Like the factfinder at trial, we weigh the evidence in the record and determine whether a discrepancy in a witness's testimony—including a lapse in perception, memory, or recall—was either the result of an innocent mistake or a deliberate lie. *See United States v. Goode*, 54 M.J. 836, 844 (N.M. Ct. Crim. App. 2001).

We are convinced of the Government's proof that Appellant touched CP's genitals without consent, and that he did so with intent to gratify his own sexual desire. We are convinced of Appellant's guilt notwithstanding Appellant's contentions about CP's intoxication, selective memories, details CP omitted in statements he made to his girlfriend and to another officer after the incident, and claimed motive to exaggerate.

Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of the remaining specification of Charge I beyond a reasonable doubt. Thus, we

find Appellant's conviction factually sufficient.

## C. Striking of Appellant's Testimony

Appellant contends the military judge abused his discretion when he struck Appellant's testimony concerning the "sexual transaction" at issue in the specification of Charge I, alleging abusive sexual contact of CP. We are not persuaded.

### 1. Mil. R. Evid. 412 Notice and Background[21]

Before arraignment, and in accordance with the notice provision of Mil. R. Evid. 412(c)(1), the Defense informed the military judge and Prosecution of its intention to admit evidence that CP was in a serious and committed romantic relationship at the time of the alleged abusive sexual contact offense involving CP. The military judge ruled that Mil. R. Evid. 412 did not implicate the admission of this evidence.[22] Neither that evidence nor the military judge's ruling allowing the members to receive it were later challenged at trial or in this appeal.

Importantly, and in compliance with Mil. R. Evid. 412(c)(1), the Defense initially gave the military judge and Prosecution notice that it would move to admit evidence of CP's sexual predisposition, which later became an issue when Appellant testified in his own defense at trial as later discussed in this opinion. The notice claimed that

> during the charged event, CP told [Appellant] that CP had previously had homosexual experiences. This statement was made during the time that [Appellant] was sexually touching CP (the same touching that is charged in this case), and communicated that CP was comfortable with the touching that was occurring because the context of the statement was that CP was experienced and therefore comfortable with the nature of the touching

---

[21] Before the close of evidence, Appellant petitioned this court for a stay of his court-martial. Citing the All Writs Act, 28 U.S.C. § 1651(a), Appellant requested this court issue a writ of mandamus and order the military judge (1) to admit into evidence the portion of his direct examination that was struck from the record and (2) to instruct the members to consider this evidence. We denied the petition without prejudice to challenge the military judge's rulings and instructions to the members on appeal. *In re Washington*, Misc. Dkt. No. 2019-01, 2019 CCA LEXIS 180, at *4 (A.F. Ct. Crim. App. 18 Apr. 2019) (order).

[22] The military judge, trial counsel, and the special victims' counsel understood that the Defense would offer evidence that CP was in a relationship with his girlfriend at the time of the alleged abusive sexual contact offense. Ruling from the bench, the military judge found this line of inquiry was permissible.

that was occurring in response to [Appellant]'s efforts to ensure that the sexual behavior was mutually agreeably/consensual [sic].

Consistent with its notice, the Defense, in a written motion, moved to admit evidence that "during the charged event" in Appellant's hotel room, CP told Appellant that CP "had previously had homosexual experiences." The Prosecution rightly understood that Appellant, and not CP, was the source of this information. To this end, in response to the motion, the Prosecution replied that Appellant "has provided no evidence to show that CP made any statement regarding his prior sexual relationships."

Appellant did not testify at a closed hearing held eight days after the Defense submitted its motion. Instead, the Defense informed the military judge and the Prosecution that its position with respect to CP's sexual behavior and predisposition had changed. The Defense noticed the military judge and trial counsel that the scope of the Mil. R. Evid. 412 issues involving CP from the Defense's perspective was narrower than its earlier notice and motion:

> [Defense Counsel (DC)]: . . . With respect to [CP]'s prior homosexual acts, the [D]efense is not intending to get into that anymore. We . . . misunderstood some of the facts. So we are no longer going to be offering it -- or going to get into it on cross-examination.
>
> [Military Judge (MJ)]: Okay.
>
> DC: But, sir, *if the [G]overnment somehow opens up the door into that*, which I don't think they're going to at this point . . . as they have not provided notice of that, but if they do somehow open the door to some kind of testimony along the line of, "*I'm heterosexual*, I would never do this," or "*I'm straight*, that's why I wouldn't do that[,]" [then w]e believe the door would be open *and we would then ask for a [Mil. R. Evid.] 412 hearing to then get into that*, if that makes sense.
>
> MJ: Okay, absolutely.

(Emphasis added). The military judge then articulated his understanding was that the remaining disagreement between counsel for both parties was the admissibility of sexual behavior involving a different victim unrelated to the offense involving CP. In referring to the Defense's pretrial notice that it wanted to introduce evidence that CP told Appellant during the incident in question that CP had previously had homosexual experiences, the military judge made known his understanding that the Defense

ha[s] no intention of delving into that line of questioning with [CP] on cross-examination. However, if the [G]overnment does open the door to such rebuttal or impeachment, then it may become relevant. And, again, we'll address that also in a[n Article] 39(a)[, UCMJ, 10 U.S.C. § 839,] setting *if the [D]efense believes that door is open*.

(Emphasis added). CP's special victims' counsel (SVC) similarly understood Defense's narrowing of the issues, but cautioned that "if they go into anything further [the SVC] reserve[s] the right to object under [Mil. R. Evid.] 412."

### 2. CP's Testimony on Direct Examination

As observed earlier in this opinion, CP testified during the Prosecution's case-in-chief that after Appellant touched his penis for the first time, CP related that he was not interested in sexual activity with Appellant. Trial counsel then asked "what happened" after Appellant "did this the first time." CP replied, "I remember we had a conversation." CP recalled, without objection, "I remember talking to him afterwards telling him sorry. I'm not into you. *I'm not into that or anything like that*. I can't remember what else we talked about, but I know the incident happened again." (Emphasis added).

At the time CP testified in this regard, the Defense did not indicate it believed CP's testimony opened the door to evidence that was within the scope of Mil. R. Evid. 412 for rebuttal. No counsel requested a closed hearing after CP testified and the MJ did not direct one *sua sponte*.

### 3. Appellant's Testimony on Direct Examination

In findings, Appellant testified in his own defense and denied he committed the act underlying the charged offense. In contrast to CP's testimony, Appellant stated he did not put his hands down CP's pants or touch CP's penis at any point when CP was on the bed in Appellant's hotel room.[23] Appellant also disputed CP's version of events before the charged conduct, offering a different account of what happened when they were together in the hotel room. Appellant explained that CP followed Appellant into the room without Appellant beckoning CP to enter. Appellant testified, "We're standing in front of the bed and we're talking. The talking leads to hugging. We stopped hugging and then we sit on the foot of the bed." The two continued talking and they both "eventually lay down" on the bed.

---

[23] At the same time Appellant denied touching CP's penis, at the end of direct examination, civilian defense counsel asked Appellant this compound question: "Did you touch [CP]'s genitals without his consent?" Appellant answered, "No, sir."

Apparently in reference to the physical interaction Appellant just described to the members, civilian defense counsel inquired, without objection, "Is *it* sexualized?" (Emphasis added). Appellant answered his counsel's leading question by relating, "Not at that moment sir, no." Civilian defense counsel then asked, without objection, "Was the hug at least to some degree sexualized?" Appellant responded, "I would say it was lasting."

Appellant testified they began "discussing the night" and the girlfriends they were dating. He explained it was at that time he reached over and touched CP's thigh with his hand. In response to still more leading questions, without objection Appellant acknowledged it felt "natural" like "a progression of sexualized interaction between the two." With his hand on CP's thigh, Appellant and CP began talking about their sexual predispositions. Without objection or motion to strike from trial counsel, the following dialogue between civilian defense counsel and Appellant ensued:

> Q [Civilian Defense Counsel]. What happens from there? With your hand on his thigh?
>
> A [Appellant]. Yes, sir. *At that time we're talking about different preferences.* He relates to me that he and his girlfriend ----
>
> Q. What I'll do, is I'm not going to get into details *of what's going on in the details of his personal life. You're generally talking about some generalized sexual preferences*?
>
> A. Yes, sir.
>
> Q. As that goes on, what's the next step, what does that lead to?
>
> A. You know, my hand is on his thigh *and we are discussing our preferences at that time.*
>
> Q. And then what?
>
> A. We break contact.
>
> Q. What does he say, or what do you do that breaks that contact?
>
> A. *He talked about, he had had men and women come on to him before.*

(Emphasis added). Although trial counsel did not object to this line of questioning, the SVC for CP did, and drew the court's attention to Mil. R. Evid. 412. The SVC's objection focused on the direction that the questioning appeared to be heading. The military judge agreed with the SVC and took up the matter in an Article 39(a), UCMJ, session, held outside the presence of the members.

In that session, civilian defense counsel twice explained he "specifically instructed [Appellant] not to" get into Mil. R. Evid. 412 material. In response to

a question by the military judge, civilian defense counsel also indicated there were no other matters he intended to question Appellant about that would implicate Mil. R. Evid. 412 in any way.[24] Although civilian defense counsel's response satisfied the SVC who withdrew the objection, trial counsel put civilian defense counsel on notice that trial counsel intended to ask questions "that would delve into [Mil. R. Evid.] 412 territory on cross-examination," because of answers Appellant gave in response to questions put to him on direct.

### 4. Article 39(a), UCMJ, Sessions

In several Article 39(a), UCMJ, sessions that followed Appellant's direct examination, the military judge contrasted Appellant's testimony on the one hand, and the Defense's Mil. R. Evid. 412 notice and motion on the other. Beginning with Appellant's direct examination, the military judge expressed concern that Appellant "testified essentially regarding matters that are clearly covered under Mil. R. Evid. 412." The suggestion that follows from Appellant's testimony, the military judge explained, is that CP "engaged in mutually consensual, sexually related hugging. That they la[y] down together on the bed, and that [CP] mutually consented to [Appellant] touching [CP] on the leg." The military judge made clear "[t]here's no reference to hugging, l[ ]ying on the bed, and touching on the leg" in either the Defense's Mil. R. Evid. 412 notice or motion.

The military judge also remarked that Appellant's testimony touched on CP's alleged "sexual predisposition," as the Defense had initially "referenced and noticed" before arraignment. The military judge summarized that evidence of CP's sexual predisposition, however, "was not actually raised during motions practice and not actually addressed by the Court, and no determination was made with regard to the admissibility of that particular testimony."

The Defense maintained it had not violated Mil. R. Evid. 412 notice requirements, arguing for the first time that Appellant's testimony about what happened with CP in the hotel room was part of the "*res gestae* of the crime itself,"

---

[24] During this session, civilian defense counsel expressed a belief that the military judge had shown bias against the Defense. This discussion followed the military judge's remark "that this is probably about the fourth time that you have demonstrated on the record that there are matters that required notice, [or] that required some type of discussion ahead of time, and that we are all getting surprised by." We find the military judge did not err in failing to recuse, and we find significance in the fact that the civilian defense counsel did not request the military judge to recuse. *See United States v. Marsh*, No. ACM 38688, 2016 CCA LEXIS 244, at *10–11 (A.F. Ct. Crim. App. 19 Apr. 2016) (citing *United States v. Cooper*, 51 M.J. 247, 250 (C.A.A.F. 1999) (holding that "failing to move to disqualify the military judge strongly suggested that the defense did not believe that the military judge lost impartiality or the appearance of impartiality")). In this regard, Appellant claims no error on appeal and we find none.

and, thus, beyond the scope of the rule. Civilian defense counsel advocated "[t]here was never a touching of [CP's] penis," and that Appellant's testimony presented a "far more innocent explanation" of "what took place that night." In contrast to CP's testimony that Appellant touched CP's penis without consent, Appellant's account about what happened is "two individuals talking to each other . . . [a]nd engaging in behavior that is not criminal [and] that was not nonconsensual."

Trial counsel stressed the importance of the Government having the opportunity to challenge Appellant's innocent account of what happened in the hotel room. Trial counsel told the military judge that he intended to explore Appellant's account of what CP told Appellant, specifically Appellant's testimony "that [CP] had experienced men and women coming on to him." Trial counsel explained that depending on Appellant's answers during cross-examination, trial counsel may seek to rebut Appellant's testimony by calling CP or CP's girlfriend to testify in rebuttal.

Trial counsel did not "make any objection or stand on any position under [Mil. R. Evid.] 412(c)(1)(A) about the necessity of notice," or object to Defense's line of questioning of Appellant. Even without a prosecution objection the military judge could not reconcile the positions taken by Appellant's civilian defense counsel with the requirements of the rule. The military judge commented that "the most appropriate way" for trial counsel to seek to examine Appellant further about his account of CP's statements that implicated CP's sexual behavior would be to do so in a closed session with Appellant on the witness stand. But, the civilian defense counsel objected to Appellant "being compelled to testify" in a closed session that was "outside the presence of the members." The military judge concluded the only other option was impracticable—eliciting Appellant's testimony in the presence of the members and then making a determination whether a Mil. R. Evid. 412 exception would apply after the fact.

Ultimately, the military judge rejected the Defense's contention that Mil. R. Evid. 412 did not apply to the conduct and statements at issue that were raised by Appellant's testimony. The military judge ruled the Defense had adduced evidence raising both "sexualized conduct involving the alleged victim as well as the alleged victim's sexual predisposition." Citing Mil. R. Evid. 412, the military judge found that "[n]either the defense notice nor the defense motion made reference to [Appellant] and [CP] hugging, lying on the bed together, or the accused touching [CP]'s leg." The military judge determined that the factual assertions CP testified as constituting the act underlying the charged offense were distinct from sexual contacts Appellant described in his testimony.

The military judge further ruled that the "[c]lear implication from [Appellant]'s testimony was that the encounter with [CP], including any sexualized

nature of that encounter, was consensual[,] which implicated [CP]'s sexual orientation." The military judge reasoned "that [CP]'s sexual orientation and any evidence elicited that implicates the sexual orientation also amounts to sexual predisposition as defined in [Mil. R. Evid.] 412(d) and therefore should have been properly noticed and addressed in the [Mil. R. Evid.] 412 setting."

The military judge then considered the effect of Appellant's testimony from the perspective of a factfinder, concluding that the members might rely on it to find CP's testimony unreliable:

> The implication from [Appellant]'s testimony is that the alleged victim [CP] consented to the conduct that led up to the alleged offense even though [Appellant] denies that actual assault occurred. The implication also leaves the suggestion that [CP] may be homosexual. As presented, this evidence would have some tendency to rebut [CP]'s testimony that he was in a committed heterosexual relationship at the time of the alleged assault and had rejected any advances made by the accused. Because as [CP] testified, he was not into men or into the issues, or into the behaviors that were occurring in the hotel room on that evening, or words to that effect.
>
> . . . The testimony could also lead the members to conclude that [CP] is fabricating his testimony because he either didn't want his girlfriend at the time to know he had homosexual tendencies, or otherwise is struggling with homosexual tendencies and that's what has led him to make a false allegation. Whether or not the [D]efense actually argues those theories in findings argument is irrelevant. The seed has been planted in the minds of the members based on [Appellant]'s testimony.

The military judge then turned to examine trial counsel's desire to challenge Appellant's account of the incident in question and what CP told Appellant both during cross-examination and possibly in rebuttal. The military judge found trial counsel had "a good-faith belief" that Appellant's testimony was false, and reasoned that "[t]he [G]overnment should certainly have an opportunity to challenge [Appellant]'s claim that sexual conduct leading up to an alleged assault is consensual." The military judge concluded that "[a]llowing [Appellant] to present a theory of defense while preventing the [G]overnment to challenge that theory, violates the fundamental notions of fairness in the court-martial process."

Lastly, the military judge considered his duty under Mil. R. Evid. 412. He explained,

> The rule is clear, before admitting evidence under this rule regardless of the source, the military judge must conduct a closed hearing. The alleged victim must be afforded an opportunity to be heard to include through counsel. And, the military judge must make a determination as to whether an exception to [Mil. R. Evid.] 412 applies before the evidence is admitted. This was not done in this case as it relates to this particular evidence.

The military judge presented two options to the Defense: (1) Appellant could submit to an examination under Mil. R. Evid. 412 in a closed session so the Government could explore Appellant's account of CP's sexual behavior and sexual predisposition and the military judge would determine whether an exception to the rule applied; or (2) the military judge could provide an instruction directing the members to disregard Appellant's testimony about CP's sexual behavior and sexual predisposition when he entered the hotel room.[25]

The Defense chose neither option and affirmatively rejected the first.[26] The Defense maintained its stance from when the SVC first objected to Appellant's testimony that CP's sexual behavior was beyond the scope of the rule because it was *res gestae* of the offense. The Defense argued it was the Government, not Appellant, that sought "the Court to allow them to get into [Mil. R. Evid.] 412," and that trial counsel "can't put [Appellant] on [the witness stand] to affirmatively meet their burden where [the Defense] didn't already open the door to [Mil. R. Evid.] 412." Citing to the United States Supreme Court opinion in *Brown v. United States*, 356 U.S. 148 (1958), trial counsel responded that once Appellant elected to testify, he could not then claim "immunity from cross-examination on the matters he has himself put in dispute."

After the conclusion of the closed Article 39(a), UCMJ, session, the military judge charged the members to disregard Appellant's testimony concerning the

---

[25] The military judge *sua sponte* considered and rejected granting a mistrial on the court's own motion, concluding it "is a drastic remedy and the two options mentioned are more appropriate remedies in light of the facts and circumstances in this matter." The military judge was correct. "Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent a manifest injustice against the accused." *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990) (citation omitted). The United States Court of Military Appeals explained, "The decision to grant a mistrial rests within the military judge's discretion, and we will not reverse his determination absent clear evidence of abuse of discretion." *Id.* (citations omitted). Reviewing for plain error because trial defense counsel did not move for a mistrial, we find no plain error much less a clear abuse of discretion.

[26] Civilian defense counsel told the military judge, "[T]o the extent that the Court has ruled[,] the accused will not submit to the [G]overnment being allowed to prove their [Mil. R. Evid.] 412 through his testimony."

consensual circumstances surrounding Appellant's sexual interaction with CP in the hotel room. He instructed,

> Members of the court, you heard testimony from the accused that he believed the contact between himself and [CP] occurring prior to the charged conduct alleged in the Specification of Charge I, was consensual in nature and may have implicated [CP]'s sexual orientation. You are to disregard this portion of the accused's testimony. However, you must consider testimony by the accused wherein he denied the specific allegations, the specific charged conduct alleged in the Specification of Charge I. Any questions from any of the court members on that instruction?

A member asked if they were to disregard Appellant's testimony that "it was consensual" or just disregard the portion that addressed CP's sexual orientation. The military judge replied, "Both," and gave this explanation:

> So any suggestion or implication regarding [CP]'s sexual orientation is to be disregarded, and any testimony with regard to the sexual contact that was described, the hug, et cetera, that was as consensual, disregard that. However, do not disregard [Appellant's] flat denial that the alleged misconduct that's articulated in the Specification of Charge I, his denial that that occurred. That, you absolutely must consider. Is that clear from all the court members? I'm getting an affirmative nod.

The findings instructions given after the close of evidence further directed the members not to draw negative inferences from the military judge striking portions of Appellant's testimony.[27] While noting Defense's objection to the

---

[27] The instruction read:

> During the testimony of the accused, I instructed you to disregard portions of [Appellant]'s testimony. The fact that the Court instructed you to disregard portions of [Appellant]'s testimony should in no way be considered by you when evaluating the accused's testimony. You will not draw any inference adverse to the accused from the fact that the Court instructed you to disregard a portion of his testimony.

Judge Meginley's dissent finds the remaining specification of Charge II and Specification 5 of Charge III must be set aside without prejudice, concluding Appellant's credibility was manifestly impacted by the military judge's instruction to the members. We are not persuaded Appellant should be entitled to such an indiscriminate windfall. Even Appellant has not challenged the evidentiary sufficiency of these convictions on grounds that part of his testimony was stricken. The limiting instruction does not

court giving a curative instruction as a remedy for the challenged testimony, the military judge sought inputs from counsel for both parties on the language of the instructions and the Defense offered none.[28]

**5. Law**

We review a military judge's ruling that excludes evidence under Mil. R. Evid. 412 for an abuse of discretion. *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). A military judge abuses his or her discretion when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. White*, 80 M.J. 322, 327 (C.A.A.F. 2020) (quoting *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

Under Mil. R. Evid. 412, evidence of an alleged victim's sexual predisposition and evidence that an alleged victim engaged in other sexual behavior is generally inadmissible. Mil. R. Evid. 412(a). "'Sexual behavior' includes any sexual behavior not encompassed by the alleged offense," and "'sexual predisposition' refers to an alleged victim's mode of dress, speech, or lifestyle that does not directly refer to sexual activities or thoughts but that may have a sexual connotation for the factfinder." Mil. R. Evid. 412(d).

Our superior court has long held that the burden is on the defense to overcome Mil. R. Evid. 412's general rule of exclusion by demonstrating an exception applies. *See, e.g., United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted); *see also United States v. Fox*, 24 M.J. 110, 112 (C.M.A. 1987) ("When the defense seeks to present evidence which is subject to the exclusionary provisions of Mil. R. Evid. 412, it must clearly demonstrate that the proffered evidence is relevant, material, and favorable to its case" (citations omitted) (citing Mil. R. Evid. 412 in a pre-2016 edition of the *MCM*)). One exception

---

reach Appellant's testimony on any offense other than abusive sexual contact of CP, and it directed the members to draw no adverse inference when evaluating Appellant's testimony. In the absence of evidence to the contrary, we presume members follow a limiting instruction. *Taylor*, 53 M.J. at 198 (citations omitted).

[28] The military judge asked the Defense, "other than your previously lodged objections [to striking Appellant's testimony], [does the Defense have] anything further to add on this particular instruction?" Civilian defense counsel replied, "No, because my objection is overriding that."

provides that evidence of specific instances of sexual behavior by the alleged victim with respect to the accused is admissible if offered by the accused to prove consent. Mil. R. Evid. 412(b)(1)(B). Another exception to this rule is when exclusion of the evidence would violate an accused's constitutional rights. Mil. R. Evid. 412(b)(1)(C).

In order to show that the exclusion of evidence would violate an accused's constitutional rights, the defense must show that the evidence is relevant, material, and favorable to his defense, "and thus whether it is necessary." *Id*. at 222 (quoting *United States v. Williams*, 37 M.J. 352, 361 (C.M.A. 1993) (internal quotation marks omitted)). The term "favorable" means the evidence is "vital." *United States v. Smith*, 68 M.J. 445, 448 (C.A.A.F. 2010). Moreover, the probative value of the evidence must outweigh the dangers of unfair prejudice under a Mil. R. Evid. 403 analysis. *United States v. Gaddis*, 70 M.J. 248, 256 (CA.A.F. 2011). Military judges have "wide discretion" in applying the Mil. R. Evid. 403 balancing test; however, military judges are afforded less deference when they do not explain their analysis on the record, and we give them no deference when they do not conduct the analysis at all. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

### 6. Analysis

At the outset, we reject Appellant's argument in this appeal that the only time a military judge is permitted to strike an accused's testimony is under circumstances described in Mil. R. Evid. 301(e)(l). That rule allows a military judge to strike the direct testimony of a witness in whole or in part if the witness asserts a privilege against self-incrimination during cross-examination. We decline Appellant's invitation to interpret this or any other rule of evidence to prohibit a military judge from striking testimony under different circumstances such as in this case. Military Rule of Evidence 412, like other rules of evidence that have procedures to determine admissibility, do not provide a remedy when counsel introduce evidence without objection by opposing counsel, and without first abiding by those procedures.[29] The rules assume compliance, and not contravention.

More generally, the central point of Appellant's objection at trial and on appeal is that the military judge violated Appellant's right to testify in his own

---

[29] *See*, *e.g.*, Mil. R. Evid. 104, *Preliminary questions*; Mil. R. Evid. 513(e), *Procedures to Determine Admissibility of Patient Records or Communications*; Mil. R. Evid. 514(e), *Procedures to Determine Admissibility of Victim Records or Communications*. *But see* Mil. R. Evid. 302(d), *Noncompliance by the Accused* (concerning mental examination of an accused).

defense. Appellant also attacks the constitutionality of Mil. R. Evid. 412.[30] The conduct of Appellant's direct examination brings more than a few concerns to mind, but the constitutionality of Mil. R. Evid. 412 as applied here is not one of them. We are not persuaded to the view that the rule cannot be allowed to reach an accused who is both the source and proponent of a witness's sexual behavior and predisposition. Our first instinct when an accused wants to testify about such matters in front of the members is to ensure counsel abides by the rule's procedures to determine admissibility. Mil. R. Evid. 412(c). That was also the military judge's reaction when Appellant's testimony drew an objection from the SVC. When evidence that is within the scope of Mil. R. Evid. 412 comes before the members, we can understand that a military judge's last impulse would be to dispense with the rule.

A suitable place to begin our analysis is with Appellant's testimony; however, both Appellant at trial and our dissenting colleague, Judge Meginley, look to a much earlier point in the trial, which is where we, too, readily go. On direct examination in the Prosecution's case, CP testified about the first time when Appellant touched him sexually. Trial counsel then directed CP to tell the members "what happened" next. CP could have answered by relating at once how the incident happened again, but instead he told the members that he remembered a conversation. He recalled telling Appellant "sorry" because in CP's own words, "I'm not into you. I'm not into that or anything like that." Trial counsel's next question did not ask CP to elaborate or explain what he said, but simply asked CP to describe "how" the incident "happened again."

Even if we assume, as Appellant now claims, that CP's testimony opened the door to allow Appellant's testimony that challenged CP's exclusive heterosexuality,[31] the Defense did not make a timely objection or motion to strike CP's testimony as outside the scope of what was allowed by the military judge's

---

[30] Appellant argues in this appeal that the military judge "invented a requirement for [Appellant] to submit to questioning which is violative of the Constitution and is not contained within [Mil. R. Evid. 412] and created a remedy violative of the Constitution and not contained within any rule, striking [A]ppellant's direct testimony." Citing *United States v. Gaddis*, 70 M.J. 248, 250 (C.A.A.F. 2011), Appellant argues his "right to present constitutionally required evidence cannot bow to any concern under Mil. R. Evid. 412 about the privacy interests of the alleged victim."

[31] "It is well settled that the function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party." *United States v. Banks*, 36 M.J. 150, 166 (C.A.A.F. 1992) (citations omitted). "The scope of rebuttal is defined by evidence introduced by the other party." *Id.* (citations omitted).

Mil. R. Evid. 412 ruling.[32] Nor did the Defense ask for a closed-session Mil. R. Evid. 412 hearing as it said it would in pretrial motion practice if CP testified "along the line of, 'I'm heterosexual, I would never do this,' or 'I'm straight, that's why I wouldn't do that[ ].'" Early in the trial, the military judge ruled, "if the [G]overnment does open the door to such rebuttal or impeachment, then it may become relevant. And, again, we'll address that also in a[n Article] 39(a)[, UCMJ,] setting *if the defense believes that door is open*." (Emphasis added). We decline Appellant's suggestion that the Defense was free to rebut CP's testimony and disregard both the military judge's ruling and Mil. R. Evid. 412, which the Defense claimed for the first time that CP implicated when Appellant himself implicated the rule and drew an objection. The military judge correctly understood that an alleged victim's sexual orientation could become relevant such that its exclusion would violate the constitutional rights of an accused. Given the Defense's failure to object or request a Mil. R. Evid. 412 hearing, and Appellant's choice not to be subject to cross-examination on the topic outside the presence of the members, the military judge never ruled on this Mil. R. Evid. 412 issue.

Appellant maintains his argument at trial that it was error for the military judge to require Appellant to submit to questioning in a closed Mil. R. Evid. 412 hearing as an alternative to striking parts of his testimony. This is so, he

---

[32] Much later in the trial, after the close of evidence and during a discussion about the military judge's proposed findings instructions, the Defense moved to strike CP's testimony "with regard to the statements that [CP] made in the hotel room." Among the reasons the military judge gave when he denied the motion was that "those matters were admitted without objection." Although not raised as an assignment of error, we find no abuse of discretion, much less plain error. "Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (quoting *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)) (citing Mil. R. Evid. 103(d)) ("To be timely, an objection must normally be made before the answer is given, although some federal courts have permitted objections or motions to strike immediately after the answer."). There is no reason Appellant could not have objected at the time CP gave that testimony, which would have allowed the military judge to consider any necessary corrective action. Instead, Appellant waited until after the military judge ruled against Appellant's attempt to admit Mil. R. 412 evidence in his testimony to seize for the first time on the point that CP's testimony should have been excluded. Doing so rendered the motion to strike untimely and even more difficult to excuse under plain error review. The plain error doctrine "is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Fisher*, 21 M.J. 327, 328–29 (C.M.A. 1986) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)).

explains, because "Appellant's direct testimony already established the relevance of his testimony." Even if there was some question in the military judge's mind about its relevance, Appellant contends on appeal that the military judge erred because he should have treated his testimony as a proffer, which is not subject to cross-examination. Appellant explains that "[c]ontrary to the military judge's ruling," and citing *United States v. Sanchez*, 44 M.J. 174 (C.A.A.F. 1996), a proffer under Mil. R. Evid. 412 "is not tested by direct and cross-examination, and all balancing under the Constitution or under the Rules of Evidence must be tilted in the proponent's favor," *id.* at 178. Reasoning that trial counsel's cross-examination of an accused is limited to the scope of testimony on direct, Appellant argues the military judge erred because it was permissible for trial counsel to cross-examine Appellant in the presence of the members about "the circumstances immediately surrounding the charged sexual transaction" with CP in Appellant's hotel room without a Mil. R. Evid. 412 hearing.

Resolution of this appeal does not require this court to decide whether the military judge erred in failing to consider Appellant's testimony before the members as a proffer—when he made no offer of proof—or if Appellant's testimony at issue was admissible under the rule. Rather, our determination whether the military judge erred principally turns on whether Appellant's testimony implicated Mil. R. Evid. 412 and the procedures the military judge was required to follow. We find that it did.

The essence of Appellant's assignment of error is that the military judge erred by failing to excuse the Defense's noncompliance with procedures that a party must follow before evidence subject to Mil. R. Evid 412 may be admitted at trial. But in the case under review, it is Appellant who shouldered a burden to prove to the military judge's satisfaction and preserve for the record that evidence of CP's other sexual behavior and sexual predisposition overcame the "generally inadmissible" standard articulated in Mil. R. Evid. 412(a). The plain language of Mil. R. Evid. 412 applies to "evidence of specific instances of sexual behavior by the alleged victim . . . *offered by the accused* to prove consent . . . ." Mil. R. Evid. 412(b)(1)(B) (emphasis added). The procedures to determine admissibility of Mil. R Evid. 412 evidence require written notice at least five days before entry of pleas provided to the military judge, opposing party, and alleged victim. Mil. R Evid. 412(c)(1). Before admitting Mil. R. Evid. 412 evidence, "the military judge must conduct a hearing, which shall be closed," and in a case before members, "the military judge shall conduct the hearing outside the presence of the members." Mil. R. Evid. 412(c)(2).

Civilian defense counsel's suggestive questioning of Appellant, together with Appellant's responses, were heavily laden with evidence of CP's sexual behavior and predisposition. Appellant explained that after CP entered Appellant's hotel room there was consensual hugging and the two lay down together

on the bed. He conveyed that CP consented to Appellant touching his leg. Appellant also conveyed it was sexual because at the same time he put his hand on CP's thigh they "discuss[ed their] preferences." Appellant acknowledged civilian defense counsel's leading question about CP's conduct with Appellant up to that point was "a progression of sexualized interaction" between them. After civilian defense counsel again posed leading questions to Appellant, twice in succession, each suggesting that Appellant's contact with CP was "sexualized," Appellant was asked if the conduct felt "natural." Appellant said it did. His responses to suggestive questioning did not just disclose sexual behavior attributable to CP that implicated CP's sexual predisposition to engage in male-on-male sexual acts, it went further. Appellant said that CP had both men and women come on to him, and that was when the SVC objected. Curiously, even before this line of questioning drew an objection, the civilian defense counsel himself implicated CP's sexual history with this statement that he set in a question posed to Appellant: "I'm not going to get into details of what's going on in the details of his [CP's] personal life."

The inference from this line of questioning was clear: CP consented to the conduct in Appellant's hotel room because he was either gay or bisexual, which plainly put the burden on Appellant as the source and proponent of "evidence of specific instances of sexual behavior by the alleged victim . . . *offered by the accused* to prove consent . . . ." Mil. R. Evid. 412(b)(1)(B) (emphasis added). We conclude the military judge did not abuse his discretion in finding that Appellant's testimony implicated Mil. R. Evid. 412. Significantly, civilian defense counsel's questioning of Appellant elicited evidence that CP had a predisposition to engage in male-on-male sexual conduct, a matter which the Defense initially gave notice of its intent to pursue and then affirmatively abandoned before trial on the merits. There are ample bases to support the military judge's conclusion. The rule plainly embraces an alleged victim's sexual predisposition, Mil. R. Evid. 412(a), which is defined to mean "an alleged victim's . . . lifestyle that does not directly refer to sexual activities or thoughts but that may have a sexual connotation for the factfinder." Mil. R. Evid. 412(d); *see also* Mil. R. Evid. 404(a)(2)(B) (accused may offer an alleged victim's pertinent trait "[s]ubject to the limitations in Mil. R. Evid. 412"). Civilian defense counsel himself implicated the rule when he told Appellant in front of the members that he was not going to delve into what was going on in CP's personal life.

Because Appellant's testimony about CP's sexual predisposition plainly implicates the rule, we need not decide whether the military judge erred in finding that Appellant's account of mutually consensual hugging, lying in bed, and Appellant touching CP on the leg, are similarly within its reach. However, we note Appellant's suggestion that these acts are outside the scope of the rule because they are "res gestae" to the alleged offense leans heavily for support on *United States v. Gaddy*, No. ARMY 20150227, 2017 CCA LEXIS 179, at *5

(A. Ct. Crim. App. 20 Mar. 2017) (unpub. op.) (finding conduct "inexorably intertwined with the alleged offense itself . . . is not 'other sexual behavior,' but . . . part of the *res gestae* of the offense" (quoting Mil. R. Evid. 412(a)(1))). But *Gaddy* is not controlling authority in our jurisdiction,[33] and the question of whether and under what circumstances an alleged victim's sexual behavior may be "res gestae" was not properly before the military judge, and is unnecessary to answer here assuming it is properly before this court now.[34]

We conclude the military judge did not abuse his discretion by presenting the two options to the Defense. These options were predicated on the military judge's ruling that he would strike Appellant's testimony about CP's sexual behavior and predisposition unless Appellant complied with the rule. We reach the conclusion that the options given to the Defense, and the ruling on which they were founded, was not an abuse of discretion for the following reasons.

First, Appellant miscasts the issue as one of constitutional dimension, arguing that the military judge erred because he "conditioned Appellant's right to testify in open court on prior adverse questioning in a closed hearing."[35] But Appellant was not compelled to be a witness against himself. He affirmatively waived his right to remain silent and voluntarily took the witness stand in his own defense. Once an accused elects to testify, "[h]e cannot reasonably claim that the Fifth Amendment[36] gives him . . . an immunity from cross-examination on the matters he has himself put in dispute." *Brown*, 356 U.S. at 155–56. Appellant had "no right to set forth to the [members] all the facts which tend

---

[33] At trial, the civilian defense counsel liberally cited the summary disposition opinion of the United States Army Court of Criminal Appeals in *United States v. Gaddy*, ARMY 20150227, 2017 CCA LEXIS 179, at *5 (A. Ct. Crim. App. 20 Mar. 2017) (unpub. op.) (mem.). Appellant's briefs in support of his assignments of error and reply to the Government's answer similarly rely on *Gaddy* as if it were legal precedent and binding. However, an opinion must meet two requirements to be considered *stare decisis*. First, it must be decided by this court or a superior court within our hierarchical jurisdiction. Second, if the condition of jurisdiction has been met, the decision must have been published in an official reporter, such as West's Military Justice Reporter.

[34] Appellant denied he committed the acts underlying the charged offense involving CP. There may be merit to the Government's assertion that if the circumstances were as Appellant believed them to be, then Appellant's testimony was not "res gestae," but "other sexual behavior" requiring compliance with Mil. R. Evid. 412.

[35] Appellant's brief in support of this assignment of error similarly claims, "Neither Mil. R. Evid. 412 nor any other rule of evidence or procedure requires or permits a 'dress rehearsal' of cross-examination of the accused in a Mil. R. Evid. 412 hearing."

[36] U.S. CONST. amend. V.

in his favor without laying himself open to a cross-examination upon those facts." *Id.* at 155 (quoting *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)).

Second, and related, once Appellant waived his right to remain silent under the Fifth Amendment and presented evidence of Mil. R. Evid. 412 matters that his counsel "specifically instructed" him not to get into—at the same time guided by counsel's own questions and statements that implicated the rule— the military judge had no duty to *sua sponte* entertain a proffer and indulge the Defense's concern that Appellant avoid cross-examination on a disputed matter.[37] Appellant had no right to "take the stand to testify in h[is] own behalf and also claim the right to be free from cross-examination on matters raised by h[is] own testimony on direct examination." *Brown*, 356 U.S. at 156.

Third, the military judge did not err in his reasoning, finding that "[a]llowing the accused to present a theory of defense while preventing the [G]overnment to challenge that theory, violates the fundamental notions of fairness." The implication from Appellant's testimony was that (a) CP consented to the conduct that led up to the charged offense; (b) CP did not reject Appellant's sexual advances; and, therefore, (c) CP was not in a committed heterosexual relationship at the time of the alleged offense. We agree Appellant's testimony planted the seed that CP fabricated his testimony because he did not want his girlfriend to know he had homosexual tendencies or was struggling with homosexual tendencies. The military judge did not abuse his discretion by allowing trial counsel the opportunity to stop that seed from taking root by requiring Appellant to testify at a Mil. R. Evid. 412 hearing as a predicate to cross-examination by the trial counsel about the implications of Appellant's testimony on direct examination.

Fourth, the military judge did not err by calling for Appellant to comply with the Military Rules of Evidence. Before trial counsel was allowed to confront Appellant in open court about his version of what happened in the hotel room, or recall CP to rebut Appellant's testimony, the military judge had a duty to conduct a closed hearing to adduce the possible evidence and balance the interests at issue. *See* Mil. R. Evid. 412(c)(2), (3); Mil. R. Evid. 403. At that

---

[37] "An 'offer of proof' is a concise statement by counsel setting forth the substance of the *expected* testimony or other evidence." *MCM*, App. 22, at A22-3 (emphasis added). Appellant cites no authority, and we are aware of none, that allows an accused to testify on a contested matter, and then invoke proffer as a shield from cross-examination. Even if Appellant had asked the military judge to consider his testimony before members as the equivalent of a proffer, we are dubious the military judge would have abused his discretion or committed plain error by denying the request. We are similarly dubious there is merit to Appellant's contention that a military judge has a *sua sponte duty* to treat testimony, much less unchallenged testimony, as a proffer.

hearing, CP had a right to attend, to be heard, and to be heard through counsel. Mil. R. Evid. 412(c)(2). Because evidence of CP's sexual predisposition and other sexual behavior was put in dispute by Appellant himself, the military judge did not err when he offered a remedy that conditioned admissibility of this evidence on Appellant's compliance with the provisions of Mil. R. Evid. 412.

Fifth, and related, as revealed by Appellant's testimony on direct examination, Appellant was both the source and proponent of the disputed evidence. It was Appellant's burden to show that an exception to the rule applied. Military Rule of Evidence 412 is a rule of exclusion. *United States v. Banker*, 60 M.J. 216, 221–22 (C.A.A.F. 2004). The burden was on Appellant as the "proponent of the evidence to demonstrate why the evidence [was] admissible." *Id.* at 223 (citing *United States v. Greaves*, 40 M.J. 432, 438 (C.M.A. 1994) (additional citations omitted)). This he did not do, and Appellant affirmatively waived the opportunity after the fact.

Sixth and finally, it is the military judge and not the parties who must decide whether evidence is admissible under Mil. R. Evid. 412. The question whether evidence implicates the rule is a question of law to be decided by the military judge when raised *sua sponte* or by a party. To the extent Appellant claims the rule was inapplicable to his testimony, that claim may be a relevant consideration but it is not dispositive. To hold otherwise would effectively give a party control whether the members are allowed to consider evidence subject to Mil. R. Evid. 412.

For the foregoing reasons, we conclude the military judge did not abuse his discretion. In reaching this result, the court recognizes that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes" that other legitimate interests in the criminal process "are designed to serve." *Rock v. Arkansas*, 483 U.S. 44, 55–56 (1987) (citing *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) ("[T]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.")); *see also United States v. West*, 27 M.J. 223, 225 (C.A.A.F. 1988) ("[T]he right of an accused to present evidence in his defense must still yield to 'established rules of procedures and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence.'"). To the extent Appellant claims his constitutional right to present evidence trumped the countervailing interests of Mil. R. Evid. 412, we disagree. The military judge's ruling and the remedy he directed to address Appellant's noncompliance were to comply with the rule or have the portion of his testimony that implicated the rule stricken.

Assuming the military judge's ruling restricted Appellant's Sixth Amendment right to testify in his own defense, we are convinced the options he presented to Appellant were not arbitrary or disproportionate to the rule's purpose. Our duty in the face of a "denial or significant diminution" of an Appellant's right to testify in his own defense "requires that the competing interest be closely examined." *Chambers*, 410 U.S. at 295 (citing *Berger* v. *California*, 393 U.S. 314, 315 (1969)). Towards this end, Mil. R. Evid. 412 procedures required the military judge to ensure any admitted evidence of CP's sexual behavior or predisposition was relevant, and that its probative value outweighed the danger of unfair prejudice to CP's privacy. Mil. R. Evid. 412(c)(3). For the reasons given, we find the military judge presented a cogent and proportionate choice to Appellant and did not unlawfully infringe upon Appellant's right to testify in his own defense. Under the circumstances, the military judge did not abuse his discretion in excluding part of Appellant's testimony.

## D. Timeliness of Post-Trial Processing and Appellate Review

Appellant's court-martial ended when he was sentenced on 13 April 2019. The convening authority took action 130 days later on 21 August 2019.[38] Appellant contends that relief is warranted because the days that elapsed between sentencing and action exceeded the 120-day threshold for a presumptively unreasonable post-trial delay that the CAAF established in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). In addition, although not raised by Appellant, we consider the issue of timely appellate review. We are not persuaded that Appellant is entitled to relief.

### 1. Law

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *Moreno*, 63 M.J. at 135 (C.A.A.F. 2006)).

When the convening authority does not take action within 120 days of the completion of trial, the delay is presumptively unreasonable. *Moreno*, 63 M.J. at 142. A presumption of unreasonable delay also arises when appellate review

---

[38] Appellant had the right to submit matters to the convening authority, R.C.M. 1105(a), which the convening authority was required to consider before taking action. R.C.M. 1107(b)(3)(A)(iii). Additionally, each victim had a right to submit a written statement, R.C.M. 1105A, which the convening authority was required to consider as well. R.C.M. 1107(b)(3)(A)(iv). Nonetheless, the convening authority was powerless to change the result of trial or take any action other than to approve the adjudged findings, Article 60(c)(3)(A), UCMJ, 10 U.S.C. § 860(c)(3)(A), and sentence, Article 60(c)(4)(A), 10 U.S.C. § 860(c)(4)(A), as adjudged.

is not completed and a decision is not rendered within 18 months of the case being docketed with a Court of Criminal Appeals. *Id.* If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our Article 66(c), UCMJ, authority, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

### 2. Timeliness of Post-Trial Processing

We determine there was no violation of Appellant's right to due process and a speedy post-trial review. Applying the first two *Barker* factors, we find the length of the delay counts slightly in Appellant's favor. The ten-day delay beyond the 120-day standard is presumptively unreasonable, *see Moreno*, 63 M.J. at 142, but not excessive. The reasons for the delay count against Appellant. Between adjournment and action, the Government compiled an eight-volume record of trial that included a 1,175-page transcript. Post-trial processing was slowed somewhat by a ten-day extension Appellant was granted to submit his clemency matters.[39] Applying the third and fourth *Barker* factors, Appellant

---

[39] The convening authority's staff judge advocate served Appellant with an authenticated copy of the record of trial and the SJAR on 29 July 2019. Accordingly, Appellant's clemency submission was due ten days later on 8 August 2019. R.C.M. 1005(c)(1). Appellant's trial defense counsel requested and was granted a ten-day extension, for good

did not demand speedy post-trial processing and failed to show prejudice from the delay. These factors favor the Government.

In this case, the prejudice analysis is determinative. Because Appellant fails to demonstrate prejudice, and we find the length of the delay and the remaining factors are not so egregious as to impugn the fairness and integrity of the military justice system, we find no violation of Appellant's *Moreno* due process rights.

Recognizing our authority under Article 66(c), UCMJ, we have also considered if relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude that such an exercise of our authority is not appropriate in this case.

### 3. Timeliness of Appellate Review

Appellant's case was originally docketed with the court on 4 September 2019. The overall delay in failing to render this decision by 4 March 2021 is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine there has been no violation of Appellant's right to due process and a speedy appellate review. Analyzing the *Barker* factors, we find the delay is not excessively long. After docketing, we granted five enlargements of time—four for Appellant and one for the Government—for appellate counsel to prepare their brief in support of the assignments of error, the answer, and the reply. Among the reasons for the delay is the time required for Appellant to file his brief on 19 February 2020, and the Government to file its answer on 25 March 2020. Appellant filed a reply on 14 April 2020. Additionally, this court's review of Appellant's case generated three opinions and a lengthy and uncharacteristically complicated result.

In Appellant's 13 March 2020 opposition to the Government's motion for enlargement of time to answer Appellant's assignments of error, Appellant requested timely appellate review pursuant to *Moreno*, 63 M.J. at 129. We treat Appellant's request as a demand for speedy appellate review. However, Appellant has not pointed to any prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. *See Toohey*, 63 M.J. at

cause, and Appellant submitted matters on 16 August 2019, two days before expiration of the allotted extension of time.

362. As a result, there is no due process violation. *See id.* In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted.

## III. CONCLUSION

The findings of guilty to Charges I and II and their specifications are correct in law and fact, and affirmed. Article 66(c), UCMJ, 10 U.S.C. § 866(c). The findings of guilty to Specifications 1 through 4 of Charge III are **SET ASIDE** and those specifications are **DISMISSED WITH PREJUDICE**. The findings of guilty to Specification 5 of Charge III and Charge III are **SET ASIDE** and Specification 5 of Charge III and Charge III are **DISMISSED WITHOUT PREJUDICE** to the Government's right to reinstitute court-martial proceedings against Appellant for the same offense. The sentence is **SET ASIDE**. The case is returned to The Judge Advocate General for remand to an appropriate convening authority who may order a rehearing as to Specification 5 of Charge III and Charge III, and the sentence. Article 66(e), UCMJ, 10 U.S.C. § 866(e). Thereafter, the record of trial will be returned to this court for completion of appellate review under Article 66, UCMJ, 10 U.S.C. § 866.[40]

RICHARDSON, Judge (concurring in part, dissenting in part, and dissenting in the result in part):

I join Senior Judge Posch's opinion resolving all issues save one: I find Specification 5 of Charge III both legally and factually sufficient. This case represents a close call, but not because it is questionable whether the Air Force has a custom that officers shall not spend their weekends drinking and hanging out with enlisted members in a purely unofficial capacity. This case is a close call because the Government did not present clear testimony to prove the custom to the court members. However, considering the evidence in the light most favorable to the Government, and drawing all reasonable inferences from that evidence, I find the court members were provided enough evidence on all the elements of Specification 5 of Charge III to find Appellant guilty.

---

[40] Specification 3 of Charge II, to which the members returned a finding of not guilty, alleged that Appellant touched another person's "buttocks through the clothing . . .," but the court-martial order (CMO) described that Appellant touched the "buttocks clothing . . ." thereby omitting the words "through the." This error is also in the report of result of trial. We direct publication of a corrected CMO to remedy the error.

## A. Military Equality

The elements of Specification 5 of Charge III, alleging fraternization in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934, for which Appellant was convicted include the following: (1) Appellant was a commissioned officer; (2) Appellant fraternized with three enlisted members (Senior Airmen BC, AG, and AW) on terms of military equality by drinking and socializing with them off-duty as equals; (3) Appellant then knew they were enlisted personnel; (4) such fraternization violated a custom of the Air Force that officers shall not fraternize with enlisted personnel on terms of military equality; and (5) under the circumstances Appellant's conduct was to the prejudice of good order and discipline in the armed forces. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 83.b.

Interacting on terms of military equality, as laid out in element (4) above, is at the heart of the offense of fraternization under Article 134, UCMJ.[1] It is no wonder, then, that most social interactions between officers and enlisted personnel in the Air Force are not done on terms of "military equality" and thus do not satisfy this element. Even while having drinks with the vice wing commander, for example, military subordinates will address her by rank or "ma'am." Officer and enlisted members may socialize; it is when all the elements are satisfied that social interactions are considered criminal under Article 134, UCMJ.

## B. Contours of the Custom

Appellant would have us require testimony of the exact contours of the custom of the Air Force that prohibited the charged conduct in this case. Indeed, civilian defense counsel asked Capt JB whether there was a "black and white" custom.[2] Such is nearly impossible, as the minute details of any given relationship cannot be predicted.[3] To be sure, we cannot sustain a conviction if we do

---

[1] "The phrase 'on terms of military equality' is the 'catch phrase' that succinctly expresses the wrongfulness of the conduct engaged in by an officer who 'fraternizes' with an enlisted member." *United States v. Arthen*, 32 M.J. 541, 545 (A.F. Ct. Crim. App. 1990) (citation omitted).

[2] Custom can exist without being adopted into regulation. *See United States v. Wales*, 31 M.J. 301, 308 (C.M.A. 1990). Furthermore, as no regulation was admitted into evidence, this case does not present the issue of whether the custom is "contrary to existing law or regulation." *Id.*

[3] Unlike in *Wales, United States v. Fox*, and *United States v. Shamess*, where the custom involved one act fairly easy to define—sexual intercourse—multiple potential acts comprise the custom here. *See United States v. Fox*, 34 M.J. 99 (C.M.A. 1992); *Wales, supra*; *United States v. Shamess*, No. ACM 39434, 2019 CCA LEXIS 339 (A.F. Ct. Crim. App. 23 Aug. 2019) (unpub. op.).

not know the "existence and nature" of the custom. *United States v. Appel*, 31 M.J. 314, 320 (C.M.A. 1990). Contrary to the interpretation in the lead opinion, the United States Court of Appeals for the Armed Forces (CAAF) in *United States v. Fox* did not require exact contours; instead it stated it has "a good deal of sympathy with [the] appellant's argument that [the paramour's] testimony, substantively, does very little to establish the nature and the perimeters of any Air Force custom." 34 M.J. 99, 103 (C.M.A. 1992).

Similarly, in an unpublished case cited by the majority, *United States v. Shamess*, No. ACM 39434, 2019 CCA LEXIS 339, at *29 (A.F. Ct. Crim. App. 23 Aug. 2019) (unpub. op.), this court did not find the exact contours of the custom must be identified. Rather, it compared the quality of the evidence to that in *Fox*, finding the testimony "*more* concrete and specific as to the particular acts that constitute fraternization in the Air Force—i.e., sexual intercourse or 'sleeping together'—than the 'conclusory' and 'circuitous' testimony the court found inadequate in *Fox*, 34 M.J. at 101–03." *Id.* (emphasis added).

## C. Evidence of the Custom

This case presents no Sixth Amendment issue, unlike *United States v. Wales*, 31 M.J. 301, 309 (C.M.A. 1990), as here, the Government was unsuccessful in getting a portion of an Air Force instruction before the members. The Government did, however, present witnesses, subject to cross-examination, who provided some evidence about the charged custom. I do not find "the factfinder [was allowed] to make a determination that the custom exists without any indication on the record as to what that custom is." *Id.*

The members were provided some evidence from which they could find the contours of the custom, starting with Appellant's own testimony. When asked whether in ROTC he was taught "this lesson to not fraternize with enlisted Airmen *in the way that you eventually did*," Appellant agreed "[they] covered that curriculum at some point in ROTC." (Emphasis added). Much of Captain (Capt) JB's testimony, as referenced in the lead opinion, focused on the point of view of an individual officer, or additional custom imposed by command or career field, and not the custom in the Air Force. Nevertheless, Capt JB's testimony highlighted that there was, in fact, a "borderline between fraternization and/or being a good leader." Here too "Appellant's conduct crossed the line separating acceptable acts of comradeship and social contact between officers and enlisted individuals from improper socializing 'on terms of military equality.'" *United States v. McCreight*, 43 M.J. 483, 485 (C.A.A.F. 1996) (quoting *Manual for Courts-Martial, United States* (1955 ed.), pt. IV, ¶ 83.b.(2)).

Even the Airmen with whom Appellant fraternized recognized Appellant's conduct was beyond the border of appropriate behavior of an officer to which they were accustomed. Two of the three enlisted men with whom Appellant

fraternized as alleged in Specification 5 testified they knew that they should not be "hanging out" with an officer. They used descriptors such as "skeptical" and "uncomfortable." Based on their further testimony describing instances of "hanging out" with Appellant, the members reasonably could find "hanging out" with them regularly meant "drinking and socializing with them off-duty as equals."

When the military judge first ruled on the defense motion for a finding of not guilty pursuant to Rule for Courts-Martial (R.C.M.) 917, he found the Government had not provided sufficient witness testimony regarding the custom as required by *Wales* and *United States v. Appel*, 31 M.J. 314 (C.M.A. 1990). Before he would "formally rule on the motion," he gave the Government the opportunity to reopen its case to cure the defect, citing R.C.M. 917, Discussion. Capt JB testified that "it is a custom and a tradition" that "United States Air Force [ ] officers shall not fraternize with enlisted persons on terms of military equality" and such custom and tradition was, for him, "ingrained" starting in ROTC. After Capt JB testified, the Government again rested its case and the Defense immediately called its first witness. Nether the Defense nor the military judge revisited the military judge's informal ruling, and the military judge ultimately put to the members the question of whether Appellant was guilty of this offense.[4] One can presume both the military judge and civilian defense counsel believed testimony from Capt JB was legally sufficient to support evidence of the custom in this case.

**D. Role of the Factfinder**

While *Wales* requires a witness to testify about the custom, *Wales* does not require the factfinder to ignore the other evidence presented in the case that is relevant to the custom. Indeed, "a factfinder may permissibly conclude that the same piece of evidence proves more than one element of a charged crime, so long as this conclusion is reached independently with respect to each element." *United States v. Norman*, 74 M.J. 144, 150 (C.A.A.F. 2015).

The members could consider all the evidence presented on the merits, to include (1) the Airmen knew officers and enlisted members should not hang out in the way Appellant did with them, (2) the efforts Appellant took to keep secret the close nature of his relationship with the enlisted members, and (3) Appellant's and Capt JB's testimony about ROTC, including Appellant agreeing that ROTC instructors teach young officers not to interact with enlisted members in the way Appellant did. Thus, the members could find the Government proved, *inter alia*, the second and fourth elements of Specification 5 of

---

[4] Rule for Courts-Martial 917(a) authorizes a military judge to enter a finding of not guilty *sua sponte*.

Charge III—that Appellant fraternized on terms of military equality with three enlisted members by drinking and socializing with them off-duty as equals, and that such fraternization violated the custom of the Air Force that officers shall not fraternize with enlisted members on terms of military equality.

We do not require court members to be blank slates. The "factfinder should consider the inherent probability or improbability of the evidence, using common sense and knowledge of human nature." R.C.M. 918(c), Discussion. Here it is helpful to analogize the role of the factfinder to determine whether there was a custom and whether it was violated, to the determination of the fifth element of Specification 5—whether the conduct was prejudicial to good order and discipline. Similarly, we also can analogize cases considering the sufficiency of evidence regarding discredit to the service to the sufficiency of evidence of conduct prejudicial to good order and discipline. In *United States v. Littlewood*, 53 M.J. 349 (C.A.A.F. 2000), the CAAF considered whether the military judge erred by allowing the appellant's commander to give his opinions about the elements, including whether the conduct was prejudicial to good order and discipline, service discrediting, and indecent. The CAAF ruled the military judge erred, noting "the commander's opinions as to the propriety of such conduct in the military in general may not be matters outside the ken of the average military judge or member." *Id*. at 353.

Similarly, in *United States v. Norman*, the CAAF determined testimony from a Marine police officer was not helpful to determine whether the appellant's conduct was service discrediting. 74 M.J. 144, 150 (C.A.A.F. 2015). Instead, it found a reasonable factfinder could consider the evidence introduced at trial about how the offense occurred, as well as their own knowledge of the appellant's rank, sufficient to find the conduct service discrediting; that is, the court members "could reason that the public would expect [the a]ppellant, a noncommissioned officer who had been selected and promoted to the rank of sergeant[ ] to exhibit competence and responsibility toward someone in his care." *Id*. at 151.

Certainly, court members may not use their own knowledge as a substitute for relevant evidence presented at trial.[5] However, court members may make

[5] Judge Cox considered this position in his dissenting opinion in *Wales*: "I do believe that officers, court members, and military judges understand the distinctions between acceptable and unacceptable conduct, and that they are competent to apply the 'customs' and 'traditions' of their respective services to the facts of a particular case. . . . Obviously I have no serious dispute with the lead opinion regarding 'proof of facts' in an Article 134 'fraternization case.' How does one prove a custom? I just disagree that it needs to be proved when the facts are so abundantly clear as they are here." *Wales*, 31 M.J. at 312–13 (Cox, J., dissenting).

inferences based on evidence presented at trial. "[A] permissible inference as to an essential element is constitutional if there is a 'rational connection between the fact proved and the ultimate fact presumed. . . . [The] inference [must not be] so strained as not to have a reasonable relation to the circumstances of life as we know them. . . .'" *United States v. Lyons*, 33 M.J. 88, 90 (C.M.A. 1991) (citing *Tot v. United States,* 319 U.S. 463 (1943)) (additional citations omitted) (omissions and alterations in original). In Appellant's case the court members could consider the evidence presented relevant to the custom of the Air Force, and make reasonable inferences therefrom based on "circumstances of life" as they know them, to find there was a custom of the Air Force against officers regularly drinking and socializing with enlisted members off duty as equals as charged in this case. Thus, I would find Appellant's conviction of Specification 5 of Charge III legally as well as factually sufficient.

MEGINLEY, Judge (concurring in part, dissenting in part, and dissenting in the result in part):

I, too, join the lead opinion to the extent that it finds Appellant's convictions for Specifications 1 through 4 of Charge III (fraternization) legally insufficient, sets aside the findings of guilty, and dismisses those specifications with prejudice.

At the same time, I disagree with the opinion of my colleagues who affirm the findings of guilty to Charges I and II and their specifications because I find the military judge abused his discretion in striking a portion of Appellant's testimony. Ultimately, I believe the military judge's decision to strike portions of Appellant's testimony was clearly unreasonable and a clear abuse of his discretion. As such, I cannot determine whether Appellant received a fair trial. Accordingly, I would set aside the findings of guilty to Charges I and II and their specifications and dismiss Charges I and II and their specifications without prejudice to the Government's right to reinstitute court-martial proceedings against Appellant for the same offenses. For the same reason outlined in my opinion, I would set aside the findings of guilty to Specification 5 of Charge III and Charge III, and would dismiss without prejudice Specification 5 of Charge III and Charge III.

I agree with the facts articulated by Senior Judge Posch leading up to when the military judge instructed the members to disregard portions of Appellant's testimony. However, where our opinions differ is on the notice of Mil. R. Evid. 412 evidence, and whether the collective failure of the parties to fully resolve the issue, coupled with the military judge's instruction (which told the members to disregard Appellant's testimony that the contact between himself and CP prior to the charged conduct was consensual in nature), harmed Appellant's

credibility before the panel, raising doubt as to whether he was given a fair trial. The lead opinion squarely places all the blame of the issues related to Mil. R. Evid. 412 on Appellant's counsel—which I conclude is not justified. As the parties collectively created an extraordinary issue, an extraordinary remedy should have been given—a declaration of a mistrial.

## A. Mil. R. Evid. 412, "Res Gestae," and Notice

I see three key moments in this trial that culminated in the military judge's instruction on this issue: (1) when CP testified on direct examination that he told Appellant "*I'm not into you. I'm not into that or anything like that*;" (2) Appellant's testimony about what physically occurred in the hotel room; and, (3) Appellant's testimony that CP "*talked about, he had had men and women come on to him before.*" (Emphasis added).

Arguably, circuit trial counsel (CTC) opened the door to CP's sexuality on direct examination. Appellant subsequently testified that, after he had placed his hand on CP's thigh, CP "*talked about, he had had men and women come on to him before.*" (Emphasis added). Immediately after this comment, CP's special victims' counsel (SVC) objected, stating Appellant's testimony was "getting into [Mil. R. Evid.] 412." The military judge held an Article 39(a), UCMJ, session to discuss this situation, where ultimately the SVC withdrew the objection. The following exchange occurred:

> MJ: Okay. Alright, again, under the understanding that we will not delve into any more [Mil. R. Evid.] 412 matters unless counsel immediately calls for an Article 39(a)[, UCMJ,] session before eliciting such testimony, okay?
>
> CivDC: [Indiscernible word.], sir.
>
> CTC: Well, I'm just going to put you on notice right now, that I intend to ask questions that would delve into [Mil. R. Evid.] 412 territory on cross-examination.
>
> MJ: With regard to who?
>
> CTC: With regard to [CP] based on this witness's testimony so far.
>
> MJ: Okay, well what we'll do, is we'll take the direct examination ----
>
> CTC: Yes, sir.
>
> MJ: ---- and then we'll take that matter up in a closed session under [Mil. R. Evid.] 412, and we'll address those issues then. I'm specifically just talking about any testimony that comes out now in front of the members that implicates [Mil. R. Evid.] 412,

> there needs to be a[n Article] 39(a)[, UCMJ,] session to address that first.
>
> CTC: Yes, Your Honor.
>
> MJ: Okay.
>
> SVC1: Your Honor?
>
> MJ: Yes?
>
> SVC1: May I be heard for a moment?
>
> MJ: Yes.
>
> SVC1: Would I be able to request between the two -- between direct and cross-examination, an opportunity to discuss what's going to be discussed in cross-examination?
>
> MJ: Sure, we'll -- again, to the extent that any of this evidence is implicated and we have a session in accordance with [Mil. R. Evid.] 412, we will follow the rules contained -- you know, we'll follow the rules and procedures as it relates to [Mil. R. Evid.] 412 and I'll certainly give you all an opportunity to discuss.

Appellant was allowed to continue his direct examination, after which, in another Article 39(a), UCMJ, hearing, CP's SVC stated, "Based on what the government counsel's indicated that they would like to cross-examine on, I have concerns about [Mil. R. Evid.] 412 information. I would just like a very brief recess to find out what those questions are so I can be fully aware of what information is going to be delved into." The court then went into an Article 39(a), UCMJ, hearing to discuss the matter. During the closed hearing, CTC stated,

> I certainly don't make any objection or stand on any position under [Mil. R. Evid.] 412(c)(1)(a) about the necessity of notice. Not in-so-far as the Court may have been surprised, but this trial counsel foresaw this very real possibility. So, I'm prepared to cross-examine in that regard. However, I do believe that the witness's testimony or potential testimony concerning what was told to him by [CP] at the time of this occurrence, we would offer that under [Mil. R. Evid.] 412(b)(1)(b).

As such, (1) until the "men and women" comment, there was no objection to Appellant's testimony from CTC, SVC, or the military judge; (2) SVC did not raise an issue with civilian defense counsel—he raised a concern with CTC and where CTC wanted to go on cross-examination, apparently based on the "men and women" comment, and (3) it appears CTC was only concerned about what

CP told Appellant about CP's sexuality, and not Appellant's testimony leading up to the charged offense.

With this in mind, I break Appellant's testimony into two parts: the unobjected to, physical acts testified by Appellant (that he and CP hugged, laid on the bed, and that he touched CP's thigh), and whether those acts fall under either of the two categories in Mil. R. Evid. 412(a): "(1) [e]vidence offered to prove that any alleged victim engaged in other sexual behavior, or, (2) [e]vidence offered to prove any alleged victim's sexual predisposition." Mil. R. Evid. 412(a); *see United States v. Taylor*, ARMY 20160744, 2018 CCA LEXIS 499 (A. Ct. Crim. App. 16 Oct. 2018) (unpub. op.). The second question relates to information provided by CP to Appellant regarding CP's sexual predisposition.[1]

### 1. The Physical Acts

As to the first question, at trial and on appeal, the Defense cited *United States v. Gaddy*, ARMY 20150227, 2017 CCA LEXIS 179 (A. Ct. Crim. App. 20 Mar. 2017) (unpub. op.) (mem.), *rev. denied*, 76 M.J. 430 (C.A.A.F. 2017), to support the argument that "inextricably intertwined" behavior is not "other sexual behavior" because it is part of the *res gestae* of the alleged offense. *See also Taylor*, unpub. op. at *11. Appellant also cites *United States v. Key*, 71 M.J. 566 (N.M. Ct. Crim. App. 2012), *rev. denied,* 71 M.J. 452 (C.A.A.F. 2012), in which our sister court stated, "Sexual behavior 'includes any sexual behavior, *not encompassed by the alleged offense*.' [Mil. R. Evid.] 412(d) (emphasis added)."

Much has been made in this case regarding *res gestae*. The concept of *res gestae* was seen in military practice last year in *United States v. Robertson*, No. ACM 39061 (reh), 2020 CCA LEXIS 257 (A.F. Ct. Crim. App. 3 Aug. 2020) (unpub. op.). In *Robertson*, the military judge, ruling on a Mil. R. Evid. 413 matter, found evidence relevant (for non-propensity purposes) specifically, "to show the inter-related facts and circumstances of the alleged incident, or *res gestae*." *Id.* at *13. Regarding uncharged acts of misconduct, the court in *Robertson* noted that our predecessor court explained:

> Facts and circumstances surrounding an offense are always admissible, whether or not they fall into the category of uncharged

---

[1] Even the military judge noted this distinction, stating,

> I understand your argument on the *res gestae*, the hugging, the touching of the leg. We can debate whether or not that's something that's required to be noticed specifically, or whether or not it's in fact encompassed in the facts and circumstances of the offense. But, the alleged victim's sexual orientation is in fact a matter covered under [Mil. R. Evid.] 412.

> misconduct. This type of evidence often has been termed "res gestae." It includes conduct, or misconduct not charged, which is admissible because it is so closely intertwined with the offense charged as to be part and parcel of that offense. . . . Evidence of "res gestae" is always admissible both on the merits and during presentencing proceedings regardless of the plea, subject only to the balancing test prescribed by Mil. R. Evid. 403. *United States v. Keith*, 17 M.J. 1078, 1079–80 (A.F.C.M.R. 1984) (citation omitted); *see also United States v. Thomas*, 11 M.J. 388, 392–93 (C.M.A. 1981) (holding admission of uncharged *res gestae* acts "can be justified in terms of preventing a gap in the narrative of occurrences").

> "*Res gestae* evidence is vitally important in many trials. . . . It enables the factfinder to see the full picture so that the evidence will not be confusing and prevents gaps in a narrative of occurrences which might induce unwarranted speculation . . . ." *United States v. Metz*, 34 M.J. 349, 351 (C.M.A. 1992) (citations omitted).

*Id.* at *18–19.

Regarding the facts that CP and Appellant hugged, were lying on the bed, and the touching of the thigh, military case law suggests that Appellant did not have to provide notice as to these facts.[2] These facts are all "inextricably intertwined," encompassed by CP's allegation that Appellant's alleged touching of CP's penis. As these physical acts were "inextricably intertwined" with the allegation, they were not "other sexual behavior" because they were part of the *res gestae* of the alleged offense. I do not believe there is a requirement to provide notice or have a hearing under Mil. R. Evid. 412. I believe this evidence would have survived any Mil. R. Evid. 403 balancing test. *See United States v. Harrington*, No. ACM 39223, 2018 CCA LEXIS 456 (A.F. Ct. Crim. App. 25 Sep. 2018) (unpub. op.), *reversed on other grounds*, ___ M.J. ___, No. 21-0025, 2021 CAAF LEXIS 434 (C.A.A.F. 6 May 2021) (where this court found error when the military judge excluded events immediately preceding an alleged sexual assault because the conduct was "with respect to the person accused," per Mil. R. Evid. 412(b)(1)(B)).

Even if notice and a hearing were required, the facts articulated by Appellant regarding the *res gestae* would almost certainly have been admitted had a Mil. R. Evid. 412 hearing occurred because they were relevant to the allegation.

---

[2] Due to the lack of case law in our court on the issue of Mil. R. Evid. 412, I found case law from our sister services to be informative and persuasive.

The problem of course is that the military judge wanted to have a hearing after Appellant's direct examination on the merits was complete and civilian defense counsel indicated that his client, who was still on the stand, would not testify in a hearing, and then return back to his direct examination. In this highly unusual situation, once Appellant concluded his in-court direct examination, the military judge could have held a hearing and made a ruling based on Appellant's in-court testimony on these facts. This would have been reasonable given CTC's proffer that he was prepared to cross-examine Appellant on these *res gestae* facts, as testified.

### 2. Sexual predisposition

I believe the issue of CP's sexual predisposition allegedly discussed by CP and Appellant would also be part of the *res gestae*, but, as this evidence falls under Mil. R. Evid. 412(a)(2) (evidence offered to prove any alleged victim's sexual predisposition), I view this as a much different issue. Military Rule of Evidence 412 "is intended to 'shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to sexual offense prosecutions.'" *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (quoting *Manual for Courts-Martial, United States*, Analysis of the Military Rules of Evidence, A22-35 (2008 ed.)) (alteration omitted).[3]

---

[3] See also *United States v. Banker*, where our superior court provided guidance on the purpose of Mil. R. Evidence 412, stating,

> [Mil. R. Evid.] 412 is modeled after Federal Rule of Evidence 412 [hereinafter Fed. R. Evid.]. Like the federal rule, [Mil. R. Evid.] 412 was intended to "safeguard the alleged victim against the invasion of privacy and potential embarrassment that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the fact-finding process." *Manual for Courts-Martial, United States* (2002 ed.), Analysis of the Military Rules of Evidence [hereinafter Drafter's Analysis] at A22-36. "By affording victims protection in most instances, the rule encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders." Notes of Advisory Committee on proposed 1994 amendment, F.R.E. 412, 28 U.S.C.S. Appx 412 at 87. [Mil. R. Evid.] 412 was intended to protect victims of sexual offenses from the degrading and embarrassing disclosure of intimate details of their private lives while preserving the constitutional rights of the accused to present a defense.

60 M.J. 216, 219 (C.A.A.F. 2004) (citations omitted). The United States Court of Appeals for the Armed Forces further stated, "While evidence of a motive to fabricate an accusation is generally constitutionally required to be admitted, the alleged motive must itself be articulated to the military judge in order for him to properly assess the threshold requirement of relevance." *Id.*, at 224.

Civilian defense counsel provided notice under Mil. R. Evid. 412 that the Defense may get into CP's sexual predisposition, but abandoned this line of evidence in pretrial motions, with the caveat that if the Government opened the door to questions of CP's sexuality, they would revisit the issue (which they did not). Civilian defense counsel's notice indicates that even he realized questions about CP's sexuality could be a volatile issue.

Yet, the lead opinion implies it was the Defense's burden to raise the issue related to Mil. R. Evid. 412 and places the blame solely on the civilian defense counsel for not filing notice, despite the fact that Mil. R. Evid. 412 applies to the Government, as well as the Defense. I find this to be unfounded. In *United States v. Carista*, 76 M.J. 511, 513 (A. Ct. Crim. App. 2017), *rev. denied,* 2017 CAAF LEXIS 595 (C.A.A.F. 7 Jun. 2017), in a header aptly titled "*Goose and Gander: Application of Mil. R. Evid. 412 to Government Evidence*," the Army Court of Criminal Appeals stated,

> By its own terms the rule clearly applies to both parties. See Mil R. Evid. 412(c)(1) ("A party intending to offer evidence . . . ."). Our superior court has likewise stated, if in dicta, that Mil. R. Evid. 412 applies to both parties. *United States v. Banker*, 60 M.J. 216, 223 (C.A.A.F. 2004) ("[Mil. R. Evid.] 412(a)'s general rape shield rule is applicable to both parties."). Guided by the plain language of the rule, our superior court's prior decisions, and the agreement of both parties at oral argument, we also agree. This interpretation is also in alignment with the purpose of the rule. *Id.* at 221 (The purpose of Mil. R. Evid. 412 is "to protect alleged victims of sexual offenses from undue examination and cross examination of their sexual history.") (emphasis added). While a victim's interests are often in accord with those of the prosecution, such solidarity of purpose cannot be presumed. When a party intends to offer evidence of a victim's sexual behavior that is not part of the res gestae of the charged offense, a victim's privacy interest and the concurrent right to a notice and a hearing are not diminished because the offering party happens to be the government and not the defense.

I find the ACCA's holding in *Carista* to be quite persuasive as applied to Appellant's case. The lead opinion states that civilian defense counsel's "line of questioning was clear: CP consented to the conduct in Appellant's hotel room because he was either gay or bisexual . . . ." There is no doubt civilian defense counsel knew what he was doing, but to suggest that CTC, SVC, or the military judge was surprised or ambushed by anything Appellant said is less than convincing. CTC knew CP's sexuality would be as much of an issue as did civilian defense counsel, and when CP made his comments, opening a door to the issue,

the Government had just as much an obligation to provide notice. CTC's questioning of CP regarding his sexuality does not appear to be inadvertent; CTC also asked several questions related to CP calling his girlfriend after the incident.[4]

CTC told the military judge that although he intended to raise evidence based on Appellant's testimony, he ultimately had "no concern" about Appellant's testimony, and chose not to stand on any position under Mil. R. Evid. 412 about the necessity of notice, stating, "Not in-so-far as the Court may have been surprised, *but this trial counsel foresaw this very real possibility*." (Emphasis added). Of course CTC saw this as a "real possibility"—and not only did he open the door to it, he was prepared to make an issue out of it. CTC told the military judge he wanted to "ask questions of [Appellant] of the specifics told to him by CP during this period of time," and later argued that he "vision[ed]" Appellant saying that "CP told me that he and his girlfriend had messed around with guys before." The military judge summed up CTC's explanation by stating, "[CP] may have said something to the accused that led [him] to believe the conduct would ultimately be consensual. And you would rebut that with some other testimony." CTC responded, "Exactly."

Given that Appellant had not made any pretrial statements, CTC's "vision" was possibly based on information provided from other sources such as CP or CP's girlfriend. Other than Appellant saying, "At that time we're talking about different preferences. He relates to me that he and his girlfriend ----," there was scant testimony or inferences about CP's sexual relationship with his girlfriend during CP's or Appellant's testimony. Despite its questionable relevance (even the military judge said he was struggling to find the relevance), it was CTC who wanted to make the jump to explore CP's relationship with his girlfriend. The purpose of Mil. R. Evid. 412 is "to protect alleged victims of sexual offenses from undue examination and cross examination of their sexual history," but, it was CTC, based off his "vision" (and as the proponent of the evidence), who was prepared to explore CP's sexuality, in the middle of Appellant's testimony.

All parties were on notice of CP's sexuality being an issue, but it took them until after Appellant's direct examination to make this an issue. CTC wanted to cross-examine Appellant on Mil. R. Evid. 412 material, garnered as a result

---

[4] Interestingly, when CP called his girlfriend, he did not tell her that Appellant had touched his penis, only that Appellant "came on to me, tried to, like, kiss me and then I told her I got out of there and called her." CP then testified he did not go into detail with his girlfriend about what happened, "because it didn't come up. . . that wasn't the intention of my call. My call was to . . . vent . . . get my surprise out; just to have someone to talk to."

of CTC's own direct examination of CP. The military judge was faced with this situation: (1) a CTC, who set up questioning with CP and discussions into his sexuality; (2) an Appellant who completed his direct examination about what happened in the hotel room without objection; (3) a CTC who then provided notice to the court (in the middle of Appellant's in court testimony) that he wants a Mil. R. Evid. 412 hearing, based on questions related to CP's sexuality; and (4) a SVC who raised concerns, not based on Appellant's testimony, but based on CTC's proffer. Even though the military judge struggled to find the relevance of this line of questioning, he was prepared to put the issue of CP's sexuality squarely on Appellant. The military judge's solution to this issue created epic constitutional dilemmas for Appellant and compromised his right to present evidence, right to testify, right to effective counsel, and right to remain silent—all at once.

## B. The Striking of Appellant's Testimony

This brings me to the crux of this assignment of error. After Appellant opted not to testify in a closed Article 39(a), UCMJ, session, outside the presence of the members, the military judge suggested to CTC that he could give an instruction to the members to disregard the Appellant's testimony as to the "men and women" statement. CTC rejected this suggestion as he believed it would compromise his cross-examination. Had the military judge done as much, it is doubtful the court would be addressing this issue in this 78-page opinion.

Subsequently, after hearing argument from both sides, the military judge considered three options: (1) to declare a mistrial, which would allow the parties to start over and address the Mil. R. Evid. 412 matters in a timely fashion, but which he immediately dismissed as a drastic remedy as explained below; (2) to exclude "some portion of" Appellant's testimony; or (3) as stated in the military judge's own words, "[Appellant] gets to say what he wants on direct and [Government] you can't explore 412 matters on cross because he refuses to—or declines I'll say, refuse is a harsh word, declines to submit to testimony in a 39(a)." The military judge initially settled on two options for Appellant, which he discussed with the counsel for both parties: (1) testify in a closed hearing, or (2) "the Court [will] instruct[ ] the members to disregard [his] testimony regarding this interactions with CP when he entered the hotel room." Before instructing the members, the military judge decided to amend the second option to disregard only the portion of Appellant's testimony "that he believed the contact between himself and [CP] occurring prior to the charged conduct alleged in the Specification of Charge I, was consensual in nature and may have implicated [CP's] sexual orientation."

The lack of case law on this issue suggests that striking an accused's testimony is extraordinarily rare and would most likely be seen in cases involving

perjury or where an Appellant refuses to submit to cross-examination; neither of those instances are in play in this case. Mil. R. Evid. 301(e), *Waiver of the Privilege,* states "[a] witness who answers a self-incriminating question without having asserted the privilege against self-incrimination may be required to answer questions relevant to the disclosure, unless the questions are likely to elicit additional self-incriminating information." Mil. R. Evid. 301(e)(1) states that "[i]f a witness asserts the privilege against self-incrimination on cross-examination, the military judge, upon motion, may strike the direct testimony of the witness in whole or in part, unless the matters to which the witness refuses to testify are purely collateral." In this case, CTC did not move to strike—in fact, it was the CTC who was seeking to discuss details of Appellant's testimony that civilian defense counsel did not address.

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted). Based on these standards, coupled with the rarity of this type of issue, giving Appellant a choice to either testify in a closed Article 39(a), UCMJ, hearing to flush out any Mil. R. Evid. 412 material or strike his testimony as to what happened inside the hotel room, with respect to the physical *res gestae* acts, was clearly unreasonable—this information was part and parcel of the same facts elicited from CP. Even if one believes that Appellant should have provided notice to this unobjected testimony, once Appellant's sworn testimony was presented to the court, the military judge could have held a hearing and made a ruling on this part of the testimony. Any restriction on the right of the Appellant to testify, present evidence, or confront adverse witnesses "may not be arbitrary or disproportionate to the purposes [it was] designed to serve." *Michigan v. Lucas*, 500 U.S. 145, 151 (1991). Striking this part of Appellant's testimony was arbitrary and Appellant's constitutional rights were compromised.[5]

---

[5] "The right to present a defense is a 'fundamental element of due process of law.'" *United States v. Bautista,* 145 F.3d 1140, 1151 (10th Cir. 1997) (quoting *Richmond v. Embry,* 122 F.3d 866, 871 (10th Cir. 1997)). An accused has a constitutional right to testify. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (citing *Ferguson v. Georgia*, 365 U.S. 570, 602 (Clark, J., concurring); *Harris v. New York,* 401 U.S. 222, 225 (1971). "The

As for any testimony regarding CP's sexual predisposition, "A criminal defendant's right to testify, however, is not unlimited and may bow to accommodate other legitimate interests in the criminal trial process." *Stephens v. Miller*, 13 F.3d 998, 1002 (7th Cir. 1994) (citing *Lucas*, 500 U.S. at 149); *see also Rock*, 483 U.S. at 55. "The Supreme Court has held that the exclusion of evidence based on the failure to comply with a notice provision in a rape shield statute is not necessarily a *Sixth Amendment* violation." *United States v. Ramone*, 218 F.3d 1229, 1235 (10th Cir. 2000) (citing *Lucas,* 500 U.S. at 151–53.) "Furthermore, numerous procedural and state evidentiary rules control the presentation of evidence and do not offend a criminal defendant's right to testify." *Id.* (citing *Rock*, 483 U.S. at 55 n.11; *Chambers v. Mississippi,* 410 U.S. 284, 302 (1973)). Here, there was a rule in place specifically addressing a victim's sexual predisposition. Civilian defense counsel and CTC knew it was an issue and neither provided notice. Had the military judge simply stricken those portions of Appellant's testimony related to CP's sexual predisposition, even though arguably trial counsel opened the door, I do not believe the military judge would have abused his discretion in doing so.

## C. The Remedy - Mistrial

The only remedy appropriate in this case was a mistrial. This assessment is not made lightly. Rules for Courts-Martial 915 states,

> The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings. A mistrial may be declared as to some or all charges, and as to the entire proceedings or as to only the proceedings after findings.

In *United States v. Diaz*, our superior court, the United States Court of Appeals for the Armed Forces (CAAF), provided guidance on mistrials, stating that,

> A military judge has "considerable latitude in determining when to grant a mistrial." This Court will not reverse the military

---

right to testify is also found in the Sixth Amendment's[ ] guarantee that 'in all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." *Stephens v. Miller*, 13 F.3d 998, 1002 (7th Cir. 1994). It is also a "necessary corollary" of the constitutional guarantee against compelled testimony. *Id.* (citing *Rock*, 483 U.S. at 52.) This "necessary corollary" is derived from the Fifth Amendment's mandate that "no person . . . shall be compelled in any criminal case to be a witness against himself." *Id.*

judge's decision absent clear evidence of abuse of discretion. Our deference to the military judge's decision on a mistrial is consistent with other federal practice addressing this matter as reflected in this statement by the First Circuit:

> The trial court has a superior point of vantage, and . . . it is only rarely -- and in extremely compelling circumstances -- that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision . . . . [A] mistrial is viewed as a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair.

59 M.J. 79, 90–91 (C.A.A.F. 2003) (alterations in original) (footnote omitted) (citing *United States v. Freeman*, 208 F.3d 332, 339 (1st Cir. 2000)). The court in *Diaz* then noted that,

> The challenge for both the trial judge and the appellate court is to determine the prejudicial impact of an error. In *United States v. Pastor*, [8 M.J. 280, 284 (C.M.A. 1980)], Judge Cook focused on the difficulty of this task stating,

> > Assessment of the probable impact of inadmissible evidence upon the court members is always difficult. Sometimes an instruction to disregard the inadmissible evidence is sufficient assurance that it will not be weighed against the accused; other times the nature of the evidence is such that it is not likely to be erased from the minds of the court members. Each situation must be judged on its own facts.

*Id.* at 91.

The military judge *sua sponte* considered whether to declare a mistrial, but declined, stating, "The Court finds that a mistrial is a drastic remedy and the two options mentioned are more appropriate remedies in light of the facts and circumstances in this matter."[6] I respectfully disagree. Appellant was given a

---

[6] The military judged stated the two remedies were that,

> "[T]he accused can submit to an examination by the trial counsel in a closed session in accordance with [Mil. R. Evid.] 412 so that the matters can be fully explored, and so that the Court can determine whether an

Hobson's choice: either testify in a Mil. R. Evid. 412 hearing in the middle of his direct testimony (despite the fact he had already testified to the *res gestae* acts), or the members would receive an instruction to disregard the unobjected testimony regarding consensual acts between himself and CP. Appellant declined to choose either option presented to him by the military judge, and thus the military judge gave the following instruction to the members:

> Members of the court, you heard testimony from the accused that he believed the contact between himself and [CP] occurring prior to the charged conduct alleged in the Specification of Charge I, *was consensual in nature* and may have implicated [CP's] sexual orientation. You are to disregard this portion of the accused's testimony. However, you must consider testimony by the accused wherein he denied the specific allegations, the specific charged conduct alleged in the Specification of Charge I.

(Emphasis added).

The military judge's instruction elicited two questions from the panel. The first question was, "So we're supposed to disregard that it was consensual or just disregard the portion of sexual orientation?" The military judge responded, "Both." Another member, after reviewing his notes, asked the military judge, "So, if the situation was with a female, would that be the same kind of guidance regarding sexual orientation but of the hetero variety?" The military judge responded, "the short answer to that question is . . . there was a lengthy discussion on concepts of the law that dictate what can and can't be presented to court members for a variety of reasons. The rationale behind that, you'll just have to leave up to the fact that it was a legal issue that we addressed here in the courtroom --- and not make comparisons to other circumstances or other scenarios."

Appellant had a fundamental right to present a defense. When the military judge told the members they were to disregard Appellant's testimony regarding the contact leading up to the allegation, the military judge appeared to deny Appellant an opportunity to present a mistake of fact defense that some

---

exception to [Mil. R. Evid.] 412 applies. And if so, to what extent the evidence can be examined."

"The second option is that the Court instructs the members to disregard the accused's testimony regarding his interactions with [CP] when he entered the hotel room. The two hugged, laid on the bed, and the accused placed his hand on [CP's] leg. As well as the testimony from the accused that made any suggestion or reference to [CP's] sexual orientation." (R. 856)

of the behavior between him and CP was consensual. Looking at this cold record, and what went into the military judge's decision, I see this ruling as a clear abuse of discretion. "A curative instruction is the 'preferred' remedy for correcting error when the court members have heard inadmissible evidence, as long as the instruction is adequate to avoid prejudice to the accused." *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citation omitted). However, I do not believe it was adequate to avoid prejudice to Appellant—what makes this instruction so unusual, and not what I believe was a preferred remedy, is that after the military judge told the members to disregard Appellant's testimony that his interactions with CP before the alleged assault were consensual, *Appellant became subject to cross-examination, and in fact, subjected himself to a cross-examination.*

With his right to testify, right to remain silent, and right to present evidence all at issue, I firmly believe the instruction compromised Appellant's right to a fair trial, as I believed it impacted his credibility before the members. Members were already assessing his credibility, and as our superior court has stated, "An accused who exercises his right to testify takes his credibility with him to the stand, and it may be assailed by every proper means." *United States v. Piren*, 74 M.J. 24, 28 (C.A.A.F. 2015). In this case, by striking Appellant's testimony, Appellant's credibility was assailed not by CTC or his counsel, but by the military judge's ruling, and Appellant was denied the opportunity to present the facts leading up to the allegation. As one would reasonably expect, CTC took advantage of the situation in his closing, telling members Appellant "100 percent lacks credibility, and he came into this courtroom and raised his right hand and lied to you;" telling members, "your job is to evaluate the credibility of the witnesses, and this man [Appellant] came in here and lied to you;" and, "[Appellant] touched JA, and he touched CP, and you know it. Because in their credible accounts, you see the truth of this case. In the law, you see the explanation of his guilt. And in his testimony, you see how and why a guilty man lies."

"The weight and credibility of a witness's testimony are issues for the members alone to decide," *United States v. Bins*, 43 M.J. 79, 85 (C.A.A.F. 1995), and yet, the military judge's ruling went to the heart of Appellant's credibility. It cannot be ruled out that members, not knowing exactly why the military judge struck Appellant's testimony, held a prejudice against his credibility. It is reasonable, if not probable, to believe that when members heard CTC's argument, they concluded the reason the military judge struck Appellant's testimony was because he lied, and not because his counsel violated a rule under the UCMJ. In a way, the military judge became the trier of fact, telling the members there was no consensual behavior between Appellant and CP. Because the prejudicial impact of the instruction was so powerful against Appellant's credibility, I also cannot rule out that the instruction to disregard any consensual behavior

irreparably damaged Appellant's right to a fair trial *as to all of the charges*, and not just to the charge related to CP. As this court noted in *United States v. Vazquez*,

> Witness credibility is determined by more than just what words are said at trial. "There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury are to be guided in determining the weight and credibility of his testimony." *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891).

71 M.J. 543 (A.F. Ct. Crim. App. 2012). The CAAF noted in *Diaz*, "There are situations where the judge can 'unring the bell' but we do not believe he did so in this instance." *Diaz*, 59 M.J. at 93. I believe the words from *Aetna Life Ins. Co.* and *Diaz* hold true in this case. In other words, given the actions of all parties, I find this instruction, while an attempt to "unring the bell," ultimately cast a substantial doubt on the fairness of the proceedings and I believe a mistrial would have been manifestly necessary in the interest of justice. At a minimum, the military judge's decision to *sua sponte* strike Appellant's *res gestae* testimony regarding Appellant's testimony about consensual behavior was clearly unreasonable and an abuse of discretion. I recognize that members are presumed to follow the military judge's instructions. *See United States v. Loving*, 41 M.J. 213, 235 (C.A.A.F. 1994); *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991). I cannot presume this happened in this case, particularly given the nature of the questions the members presented before the military judge, as well as the fact that members convicted Appellant on other crimes which were completely lacking evidence.

For these reasons, I would set aside without prejudice the specification related to CP, JA, and Specification 5 of Charge III, as the instruction undermined Appellant's credibility, and ultimately his right to a fair trial.

## D. Ineffective Assistance of Counsel and Prosecutorial Misconduct

There were different notice standards between the parties. On the issue of CP's sexuality, CTC (and in some respects, SVC) was driving the proverbial train, as much as the civilian defense counsel. In reality, both civilian defense counsel and CTC were playing a game of chicken with the rules, but only the Defense was held to account for its lack of notice; the Government was not, even though it had its own notice obligations. Had a hearing been held prior to Appellant's testimony, probably, the most appropriate way to handle this issue would have been to declare a mistrial, order briefs, and hold a hearing. Yet, that did not happen.

The military judge did not hold civilian defense counsel accountable for his failure to provide notice, and specifically advised him, "You've been absolved of [the notice thing], I'm not punishing you for that, now, I'm just talking about what remedy we take with regard to addressing the evidence that's before the Court." Yet, if the civilian defense counsel *is* solely responsible for having his client's testimony stricken, as the lead opinion suggests, then arguably, the tactics he used directly compromised and damaged his client's right to a fair trial, and in turn, provided ineffective assistance of counsel. Conversely, CTC's failure to provide notice of his intent to delve into CP's sexuality could have constituted prosecutorial misconduct.[7] Appellant did not raise either of these issues as an error, and based on my review of the record, I see no need to address it. However, had I not found the issue of the military judge's ruling to strike Appellant's testimony dispositive, I would have sought to compel declarations from counsel involved in the case.

### E. Fraternization

I concur with Senior Judge Posch's opinion setting aside Appellant's convictions for fraternization related to leisure travel. The law is clear that "if the Government wishes to prosecute fraternization on the basis of a custom in the military service, testimony must be offered by a knowledgeable witness . . . about that custom." *United States v. Wales* 31 M.J. 301, 308 (C.A.A.F. 1990). In its findings case, the Government presented no evidence from a knowledgeable witness that Appellant's fraternization violated a custom of the Air Force that officers shall not fraternize with enlisted persons on terms of military equality, and as such, the Defense moved under R.C.M. 917 for a finding of not guilty on these specifications. Despite the fact that *the Government had months to prepare for this case*, the military judge agreed no evidence was presented on custom, and granted the Government an opportunity, consistent with common practice under R.C.M. 917, to correct the issue. The Government called Capt JB to offer testimony about Air Force custom, yet trial counsel did not ask him anything about how Appellant's actions violated leisure travel as a custom of the Air Force; Capt JB made a general statement and simply regurgitated the language of the element that needed to be proven. For these rea

---

[7] "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual [for Courts-Martial] rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

sons, I agree that Specifications 1, 2, 3, and 4 of Charge III should be set aside with prejudice.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court